**BROTHERHOOD OF RAILROAD TRAINMEN et al., Appellants,**

v.

**CENTRAL OF GEORGIA RAILWAY COMPANY, Appellee.**

No. 25738.

United States Court of Appeals
Fifth Circuit.

July 22, 1969.

E. S. Sell, Jr., Macon, Ga., Harold A. Ross, Cleveland, Ohio, for appellants.

Julian C. Sipple, Savannah, Ga., Charles A. Horsky, E. Edward Bruce, Washington, D. C., for appellee.

Before WISDOM and AINSWORTH, Circuit Judges, and JOHNSON, District Judge.

WISDOM, Circuit Judge:

The Brotherhood of Railroad Trainmen and the Brotherhood of Locomotive Engineers appeal from the district court's decision not to enforce part of a National Railroad Adjustment Board award against Central of Georgia.[1] The

---

1. Two complaints were originally filed. One of them was on behalf of the Brotherhood of Railroad Trainmen and of the employees the BRT represent. The other was filed on behalf of the Brotherhood of Locomotive Engineers and of employees

unions contend that the court erred: first, in exceeding the scope of review permitted by the Railway Labor Act; second, in holding that the award had "no foundation in reason or fact" for requiring the carrier to make penalty payments to the plaintiff-employee; and third, in holding that the Board failed to comply with the Act when it denied Central's request for an oral hearing on the award. We hold that the district court properly defined the narrow standard for review under the Act, but erred in applying the standard. For this and other reasons, we reverse.

\* \* \*

As the district court well put it, "If anyone doubts that the law is a living, moving, changing, growing, viable organism and institution, let him note the history of this litigation".

May 14, 1953, Central changed the home terminal of the Americus Switching Local from Americus, Georgia, to Albany, Georgia, without first negotiating the change with the unions. (In the context of this case a "local" is a train, rather than a labor organization.) The unions protested that the change contradicted the applicable contract or "schedule" of February 1, 1939, which provided, "No change in assignment of switch local service will be made except through negotiations with the engine and train service local committees." The railroad refused to rescind the change, and on February 6, 1954, the unions brought the dispute before the National Railroad Adjustment Board. They filed four separate claims. Claims 1, 2, and 4 were small, involving payment for work done by employees of the local on May 13, 1953, the day that the

change in home terminals actually occurred. The carrier does not contest those claims. In Claim 3, however, the unions requested a full day's pay for each of three railroad employees, Avera, Short, and Nunn,[2] for every day that the change in home terminals remained in effect. Pending a decision on the merits, the railroad persisted in the change, so that the claim grew larger with the passage of time.

Central defended its action on the ground that the 1939 schedule had set only the working limits of each switch local, and not its home terminal. The railroad also maintained that in 1952 the unions had acquiesced in the change even of the working limits. Central did not ask for a hearing before the Board.

After nearly five years and with the help of a neutral referee, the First Division of the NRAB, which had jurisdiction of the dispute, upheld the unions in all major respects.[3] On January 24, 1959, four days after the announcement of the decision, Central moved the Americus local's home terminal back to Americus in accordance with the Board's interpretation of the 1939 schedule. The carrier did not, however, comply with the money awards. Instead, on February 17, 1959, it requested an interpretation of the money awards, particularly as to whether Central could subtract from the sums due the employees the amount each had earned elsewhere while the switching local had been improperly relocated. Central asked for a hearing on its request.

The Board denied oral argument, explaining that an interpretation of an award "is merely a clarification \* \* \* a matter upon which the par-

the BLE represent. In both complaints, the individual complainants were the employees (or, in one case, the heir of an employee) to whom the NRAB directed the payment of money by the carrier. There was and is, however, a unity of facts and law involved in all of the claims. The complaints were treated jointly in the district court and consolidated there. Effective January 1, 1969, the Brotherhood of Railroad Trainmen merged with

other railway labor organizations and the resulting new organization is known as the United Transportation Union.

2. Nunn died while the case was pending before the First Division.

3. "Claim No. 1 sustained; Claim No. 2 sustained for Engineer Avery (sic) and Flagman Short; claim for Brakeman Nunn denied; Claims No. 3 and 4 sustained."

ties to the case cannot cast any additional light". On June 22, 1959, the Board issued its interpretation. It allowed $38,875.79 to Avera, $15,566.17 to Short, and $13,396 to Nunn's estate. These sums are the nub of the present appeal.

When Central refused to comply with the decision, the unions threatened to strike. The railroad sought a declaratory judgment that strikes to enforce orders of the NRAB are illegal, and alleged that it had offered to settle with Short for $15,566.17 and with Nunn's estate for $2,627.59. The district court dismissed the suit, on the finding that there was not a sufficiently substantial strike threat to justify a declaratory judgment.

The unions filed the present suit in the district court on January 18, 1961, seeking, under § 3 of the Railway Labor Act, 45 U.S.C. § 153, to enforce the awards made by the First Division to Avera, Nunn, and Short. Section 153 First (m) then read: "the awards shall be final and binding upon both parties to the dispute, except insofar as they shall contain a money award. * * *" Central timely answered and prayed for a de novo trial. The carrier contended that the court should go into the merits of the Board's money award. This was an unsettled question at the time. On December 8, 1965, the Supreme Court decided Gunther v. San Diego and Arizona E. R. Co., 382 U.S. 257, 86 S.Ct. 368, 15 L.Ed.2d 308, holding that a determination on the merits of a grievance is not reviewable in the courts merely because a part of the award is a money award. Gunther recognized the court's jurisdiction to determine the amount of the money award.

Because of rapidly developing changes in the law that might affect the case, the parties did not press for an early trial. The trial did not begin until June 1967. The principal effect of these changes was to limit the courts' power to review awards by the NRAB. Controversy at the trial concerned Claim 3 and, specifically, whether it was customary, given a contract violation, for the

affected employees to receive full pay for the time they had been improperly displaced, or whether, the amounts they earned in the meantime should be subtracted in mitigation of damages. The union did not assert that such undiminished pay appeared as a remedy on the face of the collective bargaining agreement. The railroad introduced testimony that it had never paid such amounts for labor contract breaches. The unions maintained a continuing objection to evidence about penalty pay customs, saying that the whole matter lay beyond the scope of judicial review. Nevertheless they introduced expert testimony of their own to show that the First Division had frequently awarded compensation for time lost, undiminished by other earnings.

The district court found that "there was, and is, no uniform custom and practice among carriers generally, or with this carrier in particular, to pay a day's pay for every contract violation or for every instance where it may be said that in some respect an employee was 'malassigned' ". On this finding and the failure of the contract to provide specifically for a double pay remedy the court concluded that "the awards under Claim 3 are * * * 'actually and undisputedly without foundation in reason or fact', and that for that reason this Court must 'have the power to decline to enforce' it". In addition, the court ruled that the First Division had failed to comply with § 3 First (j) of the Act by its refusal to grant the railroad's request for an oral argument on the Board's interpretation of the award.

The order of the court enforced the awards by the First Division on Claims 1, 2, and 4, but set aside the award on Claim 3. It also denied the unions' request for attorneys' fees. This appeal followed.

I.

This slow-moving litigation, generated by acts that took place in May 1953, has become bound up with the continuing statutory and decisional development of

judicial review of awards under the Railway Labor Act of 1926. It is necessary, therefore, to trace this development.[4]

The prime purpose of the Act, as stated in § 2(1) is "To avoid any interruption to commerce or to the operation of any carrier engaged therein". The Act originally provided that if a carrier and its employees could not agree upon the interpretation of an existing collective bargaining agreement (as opposed to the formation of a new agreement) the dispute should be solved by a board of adjustment composed equally of representatives of each side.[5] These boards proved inadequate to their task because of the frequency with which they became deadlocked. The Act did not provide any method of breaking the deadlocks, and strikes frequently occurred.[6]

In 1934 Congress amended the Act, replacing the ad hoc adjustment boards with a single agency, the National Railroad Adjustment Board.[7] The amendment vested jurisdiction in the Board over all "disputes between an employee or group of employees and a carrier or carriers growing out of grievances or out of the interpretation or application of agreements concerning rates of pay, rules, or working conditions", provided that company grievance procedures had been exhausted previously.[8] The Board consists of four divisions, each empowered to adjudicate disputes in certain specific trades.[9] Each division consists equally of members designated by the railroads and members designated by the national unions.[10] Once grievance mechanisms have been exhausted, any party governed by the contract has a right to bring the dispute before the Board; its jurisdiction does not depend upon the mutual consent of the employees and the railroad. Each party also has a right to argue orally before the division handling the dispute.[11]

The distinguishing mark of the NRAB, however, as contrasted with the original adjustment boards, is that a deadlocked division must choose a "neutral person" as a referee to decide the case.[12] That feature, of course, puts the dispute beyond the direct control of the representative of either side; it creates statutory, compulsory arbitration with a bite.

Having created this body of railroad men to solve disputes within their own field of expertise, Congress then indicated that it did not want the work of the Board to be readily undone by the courts. The Act as amended in 1934 provided that the NRAB's awards were to be "final and binding upon both parties to the dispute, except insofar as they shall contain a money award".[13] A separate amending section, however, provided for suits by employees to enforce awards in their favor handed down by the Board: "on the trial of such suit the findings and order of the division of the Adjustment Board shall be prima facie evidence of the facts therein stated." [14]

The apparent conflict between the "final and binding" provision and the "prima facie evidence" provision was resolved—temporarily—by the Supreme Court in Elgin, Joliet & Eastern R. Co. v. Burley, 1944, 325 U.S. 711, 65 S.Ct. 1282, 89 L.Ed. 1886. "In some instances judicial review and enforcement of awards are expressly provided or are

---

4. See Comment, Review of Adjustment Board Awards Under the Railway Labor Act, 34 Journal of Aiv. Law and Commerce 233 (1968).

5. See Cox and Bok, Labor Law 116 (1965); see also Brotherhood of R. R. Trainmen v. Chicago R. & I. R. Co., 1957, 353 U.S. 30, 35, 77 S.Ct. 635, 1 L.Ed.2d 622, 626.

6. Ibid.

7. 48 Stat. 1189.

8. 45 U.S.C. § 153 First (i).

9. 45 U.S.C. § 153 First (h).

10. 45 U.S.C. § 153 First (b) and (c).

11. 45 U.S.C. § 153 First (j).

12. 45 U.S.C. § 153 First (l).

13. 45 U.S.C. § 153 First (m).

14. 45 U.S.C. § 153 First (p).

contemplated. Section 3 First (p); cf. § 3 First (m). When this is not done, the Act purports to make the Board's decisions 'final and binding'. Section 3 First (m)." 325 U.S. at 727, 65 S.Ct. at 1292.

Some of the lower courts construed this case as authorizing trials de novo in suits to enforce Board awards. These courts treated the money award as just another form of expert testimony which they were free to reject in the face of more substantial evidence on the other side. *See* Russ v. Southern R. Co., 6 Cir. 1964, 334 F.2d 224, 227. That was the law as it stood when the unions filed their complaints in the district court to enforce the awards made to Nunn, Short, and Avera by the First Division.

In December 1965 the Supreme Court decided Gunther v. San Diego & Arizona E. R. Co., 1965, 382 U.S. 257, 86 S.Ct. 368, 15 L.Ed.2d 308. This decision substantially restricts the power of the courts to review findings and orders made by the Board [15] despite the practice of de novo trials in lower courts and the express provision in § 3 First (p) of the Act that findings and orders of the Board were merely "prima facie evidence of the facts stated therein". The railroad had discharged Gunther because of an alleged physical disability reported by one of its examining physicians.

Gunther sought reinstatement and back pay from the Railroad Adjustment Board. The Board appointed a medical committee to examine Gunther, and the committee concluded that his health was adequate to qualify him for his job. The Board thereupon awarded reinstatement and back pay. The railroad refused, however, to comply, maintaining that since the collective bargaining agreement provided full managerial discretion upon the choice of examining physicians, the Board had erred in submitting the controversy to its own group of doctors. Gunther sued for enforcement in the district court, but the court agreed with the railroad's position and declined to enforce the award. The Supreme Court held that this refusal constituted error:

'Certainly it cannot be said that the Board's interpretation was *wholly baseless and completely without reason*. We hold that the District Court and the Court of Appeals as well went beyond their province in rejecting the Adjustment Board's interpretation of this railroad collective bargaining agreement.' 382 U.S. at 261, 86 S.Ct. 371 (Emphasis added.)

Under *Gunther*, even in this suit to enforce a money award, it is an incontrovertible fact that the carrier breached the 1939 agreement. In June 1966 Con-

15. With regard to the scope of judicial review under the Railway Labor Act as it then read, the Court spoke as follows:

The Railway Labor Act as construed in the foregoing and other opinions of this Court does not allow a federal district court to review an Adjustment Board's determination of the merits of a grievance merely because a part of the Board's award, growing from its determination on the merits, is a money award. The basic grievance here—that is, the complaint that petitioner has been wrongfully removed from active service as an engineer because of health —has been finally, completely, and irrevocably settled by the Adjustment Board's decision. Consequently, the merits of the wrongful removal issue as decided by the Adjustment Board must be accepted by the District Court. 382 U.S. at 264, 86 S.Ct. at 372.

With regard to the magnitude of the award, however, the Court interpreted the Act to allow a different scope of review. Though the Board's finding on the merits of the wrongful discharge must be accepted by the District Court, it has power under the Act to determine the size of the money award. The distinction between court review of the merits of a grievance and the size of the money award was drawn in [Brotherhood of] Locomotive Engineers v. Louisville & Nashville R. Co., supra, 373 U.S. [33] at pp. 40–41 [83 S.Ct. 1059, pp. 1063, 1064, 10 L.Ed.2d 172, at p. 178], when it was said that the computation of a time-lost award is "an issue wholly separable from the merits of the wrongful discharge issue." 382 U.S. at 264, 86 S.Ct. at 372.

gress adopted several amendments to the Railway Labor Act.[16] First, § 3 First (m) was changed to provide that "awards shall be final and binding upon both parties to the dispute", *with no exception for money awards*. Second, § 3 First (p) was changed to provide that the Board's findings and order shall be *"conclusive" rather than "prima facie evidence"* in suits for enforcement. The apparent effect of these two provisions is to eliminate review even in the limited area of money awards set apart by the Court in *Gunther*. A third change has caused trouble, for it seems to re-open awards to judicial scrutiny with respect not only to money awards but to the merits of the Board's order as well. This amendment provides:

[S]uch order may not be set aside except for failure of the division to comply with the requirements of this chapter, for failure of the order to conform, or confine itself, to *matters within the scope of the division's jurisdiction*, or for fraud or corruption by a member of the division making the order. (Emphasis added.)

These grounds for reversal pertain to suits both to enforce the Board's orders and to set them aside. Thus the 1966 amendments delete the merits-money award distinction recognized in *Gunther*, and close all provision for judicial review by substituting "conclusive" for "prima facie" in describing the weight due to Board awards; at the same time the amendments reopen review on three specific grounds: (1) failure of the NRAB to comply with the Railway Labor Act, (2) fraud or corruption, or (3) failure of the order to conform, or to confine itself to matters within the jurisdiction of the NRAB.

The report on the amendments by the Senate Labor and Public Welfare Committee explains that the thrust of the new legislation is to bring the review of NRAB awards into line with the existing standard of review applicable to labor arbitration awards:

Also, because the National Railroad Adjustment Board has been characterized as an arbitration tribunal by the courts, the grounds for review should be limited to those grounds commonly provided for review of arbitration awards. H.R. 706 provides an equal opportunity for judicial review and limits that review "for failure of the division to comply with the requirements of this Act, for failure of the order to conform, or confine itself to matters within the scope of the division's jurisdiction or for fraud or corruption by a member of the division making the order".

The committee gave consideration to a proposal that the bill be amended to include as a ground for setting aside an award "arbitrariness or capriciousness" on the part of the Board. The committee declined to adopt such an amendment out of concern that such a provision might be regarded as an invitation to the courts to treat any award with which the court disagreed as being arbitrary or capricious. This was done on the assumption that a Federal court would have the power to decline to enforce an award which was actually and indisputedly without foundation in reason or fact, and the committee intends that, under this bill, the courts will have that power. The limited grounds for judicial review provided in H.R. 706 are the same grounds that are provided in section 9 of the Railway Labor Act and also Public Law 88–108, which provided arbitration for the so-called work rules dispute. 1966 U.S.Code Cong. & Admin.News, p. 2287.

The "assumption" of the Committee that utterly unfounded awards will not be enforced by the courts seems to be at war with the rejection of "arbitrariness and capriciousness" as adequate grounds for reversal. It also seems to contradict the explicit statutory statement that

16. Pub.L. 89–456.

only three grounds—"unstatutoriness", corruption, or lack of jurisdiction—will suffice to overturn an award, and with statements that all awards are "final and binding", regardless of whether they pertain to money, and "conclusive" as well. The intimation that Congress meant to incorporate the standard of review employed in Public Law 88–108 further obscures the issue since that statute has been interpreted to forbid a court's inquiring into the merits of decisions made by a special arbitrating body established by the law to resolve the national "work-rules" dispute.[17] Furthermore, since the report fails to mention *Gunther* directly and since the amendments wiped out the money-award exception, there is at least an implication that the authors considered that the rule in *Gunther*, which forecloses even a glimpse at the merits, now applies to all awards, with or without money provisions. That implication, again, does not square with the "assumption" about baseless awards.

The unions contend that the amendments make all NRAB awards conclusive except for the three stated grounds of "unstatutoriness", corruption, and lack of jurisdiction. The railroad argues that we should distinguish between grounds such as those in the statute itself for "setting aside" an award, and grounds such as those in the Senate report for "declining to enforce." an award.[18] Central explains that while the three stated grounds may exclude all other justifications for "setting aside" an award, they do not affect the court's inherent power to withhold its positive approval of another body's decision by "declining to enforce" it. The railroad's suggestion, however, would render meaningless the statutory exceptions by allowing the courts to decline to enforce for different reasons. Central suggests that setting aside an award is more severe than merely declining to enforce, since, unlike declining to enforce, it involves rejection of the entire award. That interpretation does not bear up in the face of the statute itself: Section 3 First (g) of the amended Act refers to setting awards aside "in whole or in part".

The report is somewhat less than crystal-clear because of the inherent difficulty of explaining when a "final and binding" order is not final and binding. It is evident, however, that the scope of review is much narrower than the "substantial evidence" test affords. Moreover the report does supply content to the statutory exceptions by characterizing the Board as an "arbitration tribunal".[19] In the arbitration context, an award "without foundation in reason or fact" is equated with an award that

---

17. In Brotherhood of Loc. Fire & Eng. v. Chicago B. & Q. R. Co., D.D.C.1964, 225 F.Supp. 11, aff'd 118 U.S.App.D.C. 100, 331 F.2d 1020, cert. denied 377 U.S. 918, 84 S.Ct. 1181, 12 L.Ed.2d 187, the court construed the language of 45 U.S.C. § 159 in connection with P.L. 88–108, which required mandatory arbitration and limited the range of judicial review to the same grounds and substantially the same language, as are set forth in P.L. 89–456. The court held that it could not review the question whether there was substantial evidence to sustain the findings.

18. Central does not contend that the amendments were passed too late to govern this case. See Brotherhood of R. R. Trainmen v. Denver & R. G. W. R. Co., 10 Cir. 1967, 370 F.2d 833; Hanson v. Chesapeake and Ohio Railroad Co., S.D. W.Va., 1968, 291 F.Supp. 401.

19. Secretary of Labor Wirtz reported to the Senate Committee on Labor and Public Welfare as follows, in part: "The bill would eliminate court review by trial de novo in grievance cases referable to the National Railroad Adjustment Board and make the findings of the Board final and binding except for judicial review on grounds generally applicable to arbitration awards. * * *"

The Senate Committee also pointed out the arbitration standard in summarizing the bill: "The bill also provides that judicial review of orders of the National Railroad Adjustment Board, and of boards established under this legislation, relating to minor disputes in the railroad industry, would be available to either party, but limited to the determination of questions traditionally involved in arbitration legislation. * * *"

exceeds the authority or jurisdiction on the arbitrating body. To merit judicial enforcement, an award must have a basis that is at least rationally inferable, if not obviously drawn, from the letter or purpose of the collective bargaining agreement. The arbitrator's role is to carry out the aims of the agreement, and his role defines the scope of his authority. When he is no longer carrying out the agreement or when his position cannot be considered in any way rational, he has exceeded his jurisdiction. The requirement that the result of arbitration have "foundation in reason or fact" means that the award must, in some logical way, be derived from the wording or purpose of the contract. This Court in Safeway Stores v. American Bakery Workers Local 111, 5 Cir. 1968, 390 F.2d 79, 81, 82, has recently announced the standard for review of an arbitrator's reward: " '[I]f the award is arbitrary, capricious or not adequately grounded in the basic collective bargaining contract, it will not be enforced by the courts.' * * * On its face the award should ordinarily reveal that it finds its source in the contract and those circumstances out of which comes the 'common law of the shop.' "

■■ The broad leeway that courts must afford to arbitrators' decisions stems from the fact that "[i]t is the arbitrator's construction which was bargained for; and so far as the arbitrator's decision concerns construction of the contract, the courts have no business overruling him because their interpretation of the contract is different from his." United Steelworkers of America v. Enterprise Wheel and Car Corp., 1960, 363 U.S. 593, 599, 80 S.Ct. 1358, 1362, 4 L.Ed.2d 1424, 1429. Here, Congress has sought to incorporate that standard into a compulsory, rather than voluntary, scheme of arbitration. The Supreme Court elaborated on the arbitrator's role in *Enterprise Wheel*, the

last of the "Steelworker Trilogy" on arbitration:

'When an arbitrator is commissioned to interpret and apply the collective bargaining agreement, he is to bring his informed judgment to bear in order to reach a fair solution of a problem. This is especially true when it comes to formulating remedies. There the need is for flexibility in meeting a wide variety of situations. The draftsmen may never have thought of what specific remedy should be awarded to meet a particular contingency. Nevertheless, an arbitrator is confined to interpretation and application of the collective bargaining agreement; he does not sit to dispense his own brand of industrial justice. He may of course look for guidance from many sources, yet his award is legitimate only so long as it draws its essence from the collective bargaining agreement. When the arbitrator's words manifest an infidelity to this obligation, courts have no choice but to refuse enforcement of the award.' 363 U.S. at 597, 80 S.Ct. at 1361.

The specific reference to remedies imposed by arbitrators makes it all the more applicable to the case before us. While logic would suggest that the arbitrator has more leeway in formulating the remedy for a breach than he does in reading the explicit terms of the contract, it is clear that he is not an utterly free agent, even in that respect. His decision still must be drawn from the "essence" of the contract. If there is no rational way to explain the remedy handed down by the arbitrator as a logical means of furthering the aims of the contract, that is, if an award is "without foundation in reason or fact", the award lies beyond the arbitrator's jurisdiction.

There is nothing unusual in whittling finality language down to size, whether a Senate Committee does it or a court does it.

■ "Finality" is a mirage if relied upon to preclude *any* judicial review of

an arbitration award or administrative agency's decision.[20] See, for example, Oestereich v. Selective Service Board No. 11, 1968, 393 U.S. 233, 89 S.Ct. 414,

20. "Perhaps the most striking feature of the law of reviewability is the unreliability of the literal words of statutes, no matter how clear and unequivocal." 4 Davis, Administrative Law Treatise § 2801 (1958). Similarly, in England, in the face of direct prohibitions of judicial review, English courts have "clung tenaciously to their powers of review." De-Smith, Judicial Review of Administrative Action, pp. 222–49, at p. 247 (1957). "[T]he availability of judicial review is, in our system and under our tradition, the necessary premise of legal validity. It is no doubt logically possible for the immediate possessor of power to keep within imposed limits. For the most part he does so, and may indeed be very eager to do so; and furthermore, in the vast hierarchy of a modern administration, there is always the possibility of appeal to and rectification by a higher level within the hierarchy. Yet there is in our society a profound, tradition—taught reliance on the courts as the ultimate guardian and assurance of the limits set upon executive power by the constitutions and legislatures. * * *" Jaffee, The Right to Judicial Review, 71 Harv.L.Rev. 401, 403 (1958).

The following cases are a sampling of decisions allowing review in the teeth of statutory language facially precluding review. The Universal Military Training and Service Act provides that decisions of the local board are "final," 50 U.S. C.A.Appendix, § 460(b) (3). Judicial interpretation of "final" has made it less than "final." When a local board acts in disregard of the law or without evidence to support its finding, it acts outside of its jurisdiction. Estep v. United States, 1945, 327 U.S. 114, 66 S.Ct. 423, 90 L.Ed. 567; Dickinson v. United States, 1953, 346 U.S. 389, 74 S.Ct. 152, 98 L. Ed. 132. In deportation cases the finality clause does not bar review of fair procedure, statutory interpretation, and evidence to support the finding. Kessler v. Strecker, 1939, 307 U.S. 22, 59 S.Ct. 694, 83 L.Ed. 1082; Heikkila v. Barber, 1953, 345 U.S. 229, 73 S.Ct. 603, 97 L.Ed. 972. In United States ex rel. Hintopoulos v. Shaughnessy, 1957, 353 U.S. 72, 77 S.Ct. 618, 1 L.Ed.2d 652, the Court allowed judicial review of the question whether the Board of Immigration Appeals "applied * * * correct legal standards." In spite of the language of the Second Renegotiation Act, 50 U.S. C.A. Appendix, § 1191(e) that a determination "shall not be reviewed or redetermined by any court or agency", Blanchard Mach. Co. v. R. F. C. Price Adjustment Board, 1949, 85 U.S.App.D.C. 361, 177 F.2d 727, cert. denied, 339 U.S. 912, 70 S.Ct. 571, 94 L.Ed. 1338, allowed review of jurisdictional questions. In United States v. California Eastern Line, 1955, 348 U.S. 351, 75 S.Ct. 419, 99 L.Ed. 383, the Court held that the question whether a contract was renegotiable was reviewable. In Hospoder v. United States, 3 Cir. 1953, 209 F.2d 427, 429, the Court was faced with a mandamus proceeding brought to require the Veterans' Administration to give the plaintiff a rehearing on his disability claim in spite of statutory language providing that decisions of the administrator of Veterans' Affairs "shall be final and conclusive on all questions of law and fact, and no other official or court of the United States shall have jurisdiction to review by mandamus or otherwise any such decision." 38 U.S. C.A. § 11a–2. Not one but two sections declared that the Administrator's decisions were final and review was prohibited. Id. § 705 [Now 38 U.S.C.A. § 211]. Nevertheless, the Court held that "in a proper case under Section 11a–2 mandamus will lie even though the district court may not review the Administrator's factual or legal determinations." Compare Siegel v. United States, E.D.N.Y.1949, 87 F. Supp. 555, 558, stating that when "the equity powers of the court are properly invoked by a clear showing that the administrative officer acted in excess of the jurisdiction conferred, appropriate relief may be obtained."

"The supremacy of law demands that there shall be [an] opportunity to have some court decide whether an erroneous rule of law was applied and whether the proceeding in which facts were adjudicated was conducted regularly. To that extent, the person asserting a right, whatever its source, should be entitled to the independent judgment of a court on the ultimate question of constitutionality", said Mr. Justice Brandeis in a concurring opinion in St. Joseph Stock Yards Co. v. United States, 1936, 298 U.S. 38, 56 S. Ct. 720, 740, 80 L.Ed. 1033. Davis and Hart are critical of this view. 4 Davis, Administrative Law Treatise § 28.18, p. 98; Hart, The Power of Congress to Limit the Jurisdiction of Federal Courts: An Exercise in Dialectic, 66 Harv.L.Rev. 1362 (1953)."

"The only common denominator of the decided cases I am able to discern is the broad principle, loosely applied, that

21 L.Ed.2d 402. There a theological student had been reclassified in violation of the Selective Service Act. The Act provides that "no judicial review shall be made of the classification or processing of any registrant by local boards, appeal boards, or the President, except as a defense to a criminal prosecution * * *." Oestereich sued to restrain his induction. The Supreme Court held that the statutory limitation upon review could not be read literally. "Examples are legion where literalness in statutory language is out of harmony either with constitutional requirements * * * or with an Act taken as an organic whole". 393 U.S. at 238, 89 S.Ct. at 417, 21 L.Ed.2d at 406. Oestereich is but the latest in a long line of similar cases.

■ We conclude therefore that the district court properly inquired into whether the awards are, in the language of the Senate Committee Report, "actually and undisputedly without foundation in reason or fact". This standard is similar to the Gunther standard: the question is whether "the Board's interpretation was wholly baseless and without reason". 382 U.S. at 261, 86 S.Ct. at 371. As the district court fairly stated:

'Whether we regard the Board as primarily an administrative tribunal, or as primarily a board of arbitration (it partakes of the nature of both), it must act responsibly, and if it, as an administrative tribunal, is construing and interpreting an agreement its interpretation must find some basis in the language of the written agreement, or in the conduct of parties under that language, or in some uniform custom and practice concurred in by the parties.'

The conclusion we reach is consistent with our recent decisions in Hodges v. Atlantic Coastline Railroad Co., 5 Cir. 1966, 363 F.2d 534, and Sweeney v. Florida East Coast Railway Co., 5 Cir.1968, 389 F.2d 113. In Hodges an employee had successfully recovered for permanent disability from the railroad under the FELA; he later reapplied for his old job and the railroad refused to reinstate him. When the case came before the NRAB it held that Hodges's previous recovery for permanent disability did not prevent him from reclaiming his old job, and that the railroad's refusal to rehire him constituted a breach of the collective bargaining agreement. The Board rejected the railroad's claim that Hodges was estopped by his earlier recovery to deny his permanent disability. This Court held that Gunther "necessarily precludes our determination of the disability issue by the Railroad, which, in turn, precludes the analogous estoppel argument". 363 F.2d at 538. "The award of the NRAB must stand as the result of 'compulsory arbitration in this limited field,' and it must be enforced." 363 F.2d at 540. The Court did not mention the 1966 amendments which had been enacted less than a month before the announcement of the decision.

In Sweeney the Board had awarded "time lost" to an engineer who had been

finality language will be whittled down to size—to fit the Court's sense of fundamental fairness, whenever that sense is offended by denial of judicial review. I do not say that the courts decide reviewability cases guided only by their own notions of abstract justice. If courts rationalize fair play in terms of "jurisdiction", "statutory construction", "due process", or some other legal concept it is always, I hope, in proper context, considering the circumstances of the case and the interplay of policy, statute, and regulation; reducing the subjective element by weighing the presence or absence of constitutional safeguards, the reasonableness of the regulatory scheme, the effectiveness of administrative relief, the adequacy of administrative check on initial action, the comparative qualifications of courts on the one hand or administrative tribunals on the other hand to decide the particular question at issue, the nature of the judicial review prayed for, the nature of the administrative action, and many other factors, some at cross-purposes." Caulfield v. U. S. Department of Agriculture, 5 Cir. 1961, 293 F.2d 217 (dissenting opinion).

improperly dismissed but had not indicated whether that was to be diminished by the amount of time he spent during the year working for another railroad. The district court refused to interpret the award, holding that to do so would go beyond its jurisdiction under the 1966 amendments. Judge Tuttle, speaking for this Court reversed: "In other words, the money award was subject to litigation de novo prior to the adoption of the amendment. It is no longer subject to such litigation. That is all that was accomplished by the adoption of the 1966 amendment referred to above." 389 F.2d at 115. Judge Tuttle went on to interpret the award in light of the frequent practice of the Board to calculate recovery without regard to the employee's interim mitigating damages, and concluded that if the Board had meant to subtract mitigating damages from the award it would have said so. *Sweeney* thus dealt with the courts' power to interpret awards, not with their power to examine their correctness. Beside the passage quoted above the Court did say that the parties "now are bound by the decision of the Adjustment Board", but no one contended that the award could be challenged on any of the three statutory grounds or that it was "without foundation in reason or fact". The whole dispute concerned an interpretation. *Sweeney*, therefore, like *Hodges,* does not tell us how to reconcile the various standards of judicial review suggested by the statute and its legislative history.

## II.

■ We turn then to decide whether the award in this case was so unfounded in reason and fact, so unconnected with the wording and purpose of the collective bargaining agreement as to "manifest an infidelity to the obligation of the arbitrator".[21] The railroad contends, and sought to prove at trial, that penalty pay of the sort granted here is unprecedented. The trial court agreed:

The evidence fails to show and this Court finds that there was, and is, no uniform custom and practice among carriers generally, or with this carrier in particular, to pay a day's pay for every contract violation or for every instance where it may be said that in some respect an employee was "malassigned".

■ Arbitrators, all parties concede, need not confine themselves to common-law remedies. Here it is undisputed that the Board in the past has frequently awarded pay undiminished by the employee's mitigating earnings.[22]

In both *Hodges* and *Sweeney* this Court upheld the award of the same sort of double-pay windfall sought by the unions for the employees here. See also Brotherhood of Railroad Trainmen v. Denver & R. G. Co., 10 Cir.1967, 370 F. 2d 833, cert. denied, 386 U.S. 1018, 87 S.Ct. 1375, 18 L.Ed.2d 456. At most, the carrier argues that none of the cases resembled the facts of the present case closely enough to deserve controlling force. Two precedents are distinguished on the ground that they differed greatly in size from the penalty pay awarded by the First Division here. Distinctions of this sort are simply too nice for the statutory standard of judicial review. The Board's failure to make such distinctions is not so great a mistake as to rob the award of rationality, and therefore put it beyond the Board's jurisdiction. The Division's precedents provided the foundation in fact and in law that is all an award of the Board requires to put it beyond the reach of the court. In light of this basis the Board surely did not act so irrationally as to exceed its jurisdiction in awarding penalty pay.

■ The Board's wide latitude to make awards can rationally be explained

21. United Steelworkers of America v. Enterprise Wheel and Car Corp., 363 U.S. 593, 597, 80 S.Ct. 1358, 1361, 4 L.Ed.2d 1424, 1428.

22. There is evidence in the record that there were between 2000 and 3000 awards of the First Division which recognize the principle of penalty pay.

in terms of the collective bargaining agreement. Custom and practice, the parties agree, are valid bases for fashioning remedies where the contract does not explicitly exclude them. When, therefore, bases in custom and practice are shown that support the particular principle of penalty pay applied in this case, the Act forecloses further judicial scrutiny of the principle.

The railroad maintains that one element of unreasonableness present in the recovery granted here is that the First Division pegged the size of the award to the duration of the illegal transfer. The duration in turn depended upon the Board's own deliberations. So long as the home terminal of the switching local remained in Albany, a condition that the Board later found illegal, the penalty pay continued to mount. Central argues that it therefore had to pay for the virtually imperceptable pace at which the First Division proceeded. The carrier points out that the practice of penalizing parties because of the Board's own backlog will discourage parties from seeking to enforce their legal rights. There is some merit in the railroad's contention, but the conclusion drawn from it is overblown. Central did not have to undergo the risks it took here; it could have moved the Americus terminal to Albany for one day to create a test case, moved it back, and then awaited the results. If it could not accept that course because of lessened efficiency and profits, then it had to demonstrate, as it did, the courage of its convictions by leaving the change in effect pending the outcome. Litigants frequently challenge statutes and interpretations by violating the letter of the law to raise the illegality or unconstitutionality of the law as a defense. The most obvious examples are defendants who have been able to challenge their Selective Service classification only by refusing induction and thereby breaking the law. To be sure, Central was here contesting not an official interpretation of its legal responsibilities, but an interpretation offered by private parties, the unions. The point is that the sort of situation that the Board forced Central into is not so unknown to the law as to make the award irrational or worse. Furthermore, the undesirable "chilling" effect on the parties is merely a prospective incident of the rule: since Central itself did not know that it would be taxed for the long deliberation of the First Division, *it* was not deterred from opposing the unions' claims. But those who would be chilled, i. e., future litigants, will find, a different statutory situation. The 1966 amendments addressed themselves specifically to the tremendous backlog that had built up on the Board's dockets, especially in the First Division. The new law allows the parties to take their cases to ad hoc "special boards" rather than to the NRAB.[23] A party in Central's position would not have to fear the piling on of penalties caused by the size of the NRAB backlog.

The mere fact that time-lost pay, undiminished by the employee's other earnings was an acceptable award here does not settle the matter. We must also consider whether the particular amounts awarded by the First Division as penalty pay had some logical source or foundation. The Board awarded $38,875.79 to Engineer Avera, a sum equal to the amount he would have made had the contract not been breached. That accords with the principle of undiminished pay as a penalty. Brakeman Nunn's widow received $13,396.56, despite the fact that he would have earned $17,059.59 had he continued to work until his death out of the Americus terminal as the contract entitled him to. The smaller award has a rational explanation: the claiming unions did not ask for more than $13,396.56 in the proceedings before the First Division. Thus, while the Division might have been prepared to grant the larger sum, it may have felt bound by the amount claimed in the grievance. That again would be a rational award.

23. 45 U.S.C. § 153 Second.

The third recovery Claim 3, however, seems utterly indefensible. The recipient, Flagman Short, would have earned $32,411.36 if he had remained on the Americus switch local during the time it was improperly removed. Instead he earned $16,845.19 working elsewhere. Those smaller earnings, however, reflect the fact that Short took a leave of absence from November 20, 1953, to March 1, 1956. The railroad, in its attempts to compromise the suit, offered Short $15,566.17. That sum represented the amount of his hypothetical earnings, absent the breach, minus the amount that he actually made; his difference in damages *disregarding* the fact that some of the difference reflected his leave of absence. In other words, Central offered to make up to Short what he would have earned if he had worked full time on the Americus switch local. The First Division, in interpreting its own award, explicitly declared that he should *not* recover for the time that he had spent on leave. That was a different formula from Central's. To apply it, the Board should have subtracted from Short's hypothetical earnings on the Americus local the amount that was attributable to the period that he spent on leave. Central computed its sum by refusing to give Short credit for the earnings he had actually made elsewhere. The Board purported to compute its sum by refusing to give Short credit for the amount of time he spent while on leave. The Board nonetheless awarded the dollar amount offered to Short by the railroad, and clearly not the amount recoverable under its own stated formula. As the appellee says in its brief "[The Board] could only have been confused on this issue". We think that while the Board's announced *principle* for determining the sum due to Short was reasonable enough to withstand setting aside, its *calculations* led to a wholly baseless result. Outright mistakes of this sort should be set aside.

### III.

Central also maintains that the First Division's denial of an oral hearing be-fore the referee violated the requirements of the statute and, perhaps, the United States Constitution. Central did not request a hearing when it submitted its case to the ten members of the First Division, although it undoubtedly had a right to argue its case at that point. The ten members could not agree on a decision and called in a referee to break the deadlock. The First Division has not permitted parties to reargue their cases before the referee in the event of a deadlock. Instead, it leaves the representatives of labor and management sitting as members to advocate the respective positions of their "constituents". Central now claims that it had a right to be heard before the referee himself, since he was to make the actual decision.

 We see some merit in this position, particularly in light of the practice in other divisions of granting separate oral argument before the referee. In this case, however, Central's assertion comes too late. The railroad made no request for an oral argument before the referee except for the late request concerning the interpretation of the award. That request came *after* the referee had initially decided the case. (We treat it separately below.) Since Central did not ask for an oral hearing before the original award appeared, the Board concluded that oral argument had been waived. The general rule, of course, is that "[p]rocedural objections to the action of an administrative agency or trial court must be timely made to give the tribunal an opportunity to correct the error, if error there be; such contentions cannot first be made on appeal". Brotherhood of Railroad Trainmen v. Chicago, M., St. P. & P. R. Co., 1967, 127 U.S.App.D.C. 58, 380 F.2d 605, 608. The railroad argues that it made no request because to do so would have been futile in light of the First Division's long-standing practice to deny an oral hearing before the referee. The law, it argues, does not require parties to do a futile thing.

 The argument might have more force if Central had requested a

hearing before the ten regular members of the First Division. Then it would be more plausible to suppose that the railroad had failed to ask for a hearing before the referee only because it knew that that would be useless. In fact, however, Central did not ask to be heard by the regular members who, for all the carrier knew at the time, were about to make the final decision. That makes it harder for the carrier now to claim that futility explains its silence below. Moreover, in cases where the failure to raise a point is excused on the ground of futility, the futility must be clear, as for example when a lower court is obviously bound by the decision of a higher court. *See, e. g.,* United States v. Manfredonia, 2 Cir.1968, 391 F.2d 229, 230. Another clear sign of futility would be the recent rejection by the same tribunal of the same argument, as was the case in the decision of International Ass'n of Machinists v. Hayes Corp., 5 Cir.1961, 296 F.2d 238, cited by the railroad here. Central does not make an adequate showing of futility in this case. We hold, therefore, that it waived any rights it had to argue orally before the referee when it failed to ask for a hearing in its submission to the Board.

## IV.

■ The railroad did, however, specifically ask for an oral argument in connection with its request for an interpretation of the First Division's original award. Central points out that § 3 First (j) of the statute seems to give a hearing by right in connection with "any dispute", and that subparagraph (m) explicitly refers to questions concerning the interpretation of awards as "disputes"; therefore, the statute guarantees a hearing in this case. The argument amounts to a legal pun, since "dispute" was clearly not intended to be read in the same manner in the two subparagraphs. Subparagraph (j) refers to "claims" or "causes", while subparagraph (m) refers to confusion or disagreement among the parties. The railroad did not seek to introduce new evidence or relitigate the merits of the award; it simply asked what the award meant. The First Division, having made the award, was presumably in a position to answer that question without the help of the railroad.

## V.

The unions argue that Central's complaint in the suit filed in 1960 to prevent a strike over enforcement of the award included an admission by Central that it owed Short $15,566.73 and that the court should have admitted it into testimony. The court did so. The court went on to hold that the complaint did not estop Central from contesting the enforcement of the award for that sum. The estoppel issue has relevance here because of our holding above that the award to Short did not merit enforcement.

■ Estoppel rests upon reliance by the invoking party upon the words or acts of the estopped party. Gullett v. Best Shell Homes, 5 Cir.1963, 312 F.2d 58, 61 n. 2. In his case the district court dismissed the railroad's anti-strike suit, and the unions cannot claim to have relied upon it. No estoppel results from the railroad's complaint.

## VI.

We conclude that the district court erred in setting aside the awards under Claim 3 to Avera and Nunn's widow. Those awards had sufficient foundation in reason and fact to merit enforcement under the narrow scope of judicial review provided by the 1966 amendments. The award to Short under Claim 3, however, had no foundation in reason: the Board erred in computing the award under the formula it had decided to use. The correct sum should be calculated by the Board itself on remand.

## VII.

■ The parties differ as to whether the railroad should shoulder the attor-

neys fees under § 3 First (p) of the Act. This section reads as follows:

If the petitioner shall finally prevail he shall be allowed a reasonable attorneys fee, to be taxed and collected as a part of the costs of the suit.

The unions have prevailed in the most substantial part of this cause. All that remains in doubt is the exact size of the award to Short which, judging from the Board's formula, may be close to the amount he originally received. We hold, therefore, that the decision of the district court to deny attorneys fees as part of costs must also be reversed.

\* \* \*

The judgment of the district court is reversed, and the case is remanded for further proceedings consistent with this opinion.