**STANDARD TANKERS (BAHAMAS) COMPANY, LIMITED, Plaintiff,**

v.

**MOTOR TANK VESSEL, AKTI, her engines, tackle, apparel, etc., and Akti Compania Naviera S. A., Defendants.**

**No. 959–A.**

United States District Court, E. D. North Carolina, New Bern Division.

Sept. 6, 1977.

---

Daniel Lee Brawley, of Marshall, Williams, Gorham & Brawley, Wilmington, N. C., David A. Nourse, of Kirlin, Campbell & Keating, New York City, for plaintiff.

John Richard Newton, of Rountree & Newton, Wilmington, N. C., John C. Mamoulakis, of Shedd, Moraites & Rathe, New York City, for defendants.

## MEMORANDUM OPINION and ORDER

LARKINS, Chief Judge:

This admiralty case is before the court on the plaintiff's (charterer) motion to confirm the arbitrator's award and the defendants' (owner and the vessel) motion to vacate the same award; both motions are submitted in accordance with the provisions of the Federal Arbitration Act, 9 U.S.C. §§ 1–14. This court clearly has jurisdiction over this dispute; the vessel "AKTI", the subject matter of the arbitration, was arrested on December 7, 1972, in Morehead City, North Carolina. 9 U.S.C. § 8.

The facts which underlie this arbitration proceeding are as follows. The charterer and the owner entered into a "charter party" agreement in October of 1969 in which the boat owner warranted, among a number of other things, that the "ATKI" would achieve a certain speed if propelled by a specific fuel described in the agreement. In 1972, a dispute arose as to the type of fuel used and the amount of fuel consumed by the "ATKI". In accordance with clause 53 of the charter party, the dispute was referred to a panel of three arbitrators; the charterer and the owner each selected one arbitrator and the United States District Court for the Southern District of New York selected the third arbitrator. After twenty-three hearings which extended over a three year period, the panel in a split vote, 2–1, decided the "fuel question" in the charterer's favor and awarded the charterer a net balance of $187,123.36. Without tracing the lengthy and involved history of this action, the court will examine below in seriatim the parties' contentions concerning the motions to confirm and to vacate the award.

## I. "INCONSISTENT AWARD"

As the first challenge to the award, the owner urges that the award is so inconsistent that the decision to award over $187,000 to the charterer exceeds the authority granted the panel by the charter party. The owner premises this attack on

the following language in 9 U.S.C. § 10(d) which directs the court to vacate the award, "Where the arbitrators exceeded their powers . . .". In *Brotherhood of Railroad Trainmen v. Central of Georgia Ry. Co.*, 415 F.2d 403 (5 Cir. 1969), the Fifth Circuit Court of Appeals discussed § 10(d) and explained that:

> In the arbitration context, an award "without foundation in reason or fact" is equated with an award that exceeds the authority or jurisdiction on the arbitrating body. * * * The requirement that the result of arbitration have "foundation in reason or fact" means that the award must, in some logical way, be derived from the wording or purpose of the contract. *Id.* at 411–412.

*See Bell Aerospace Co. Div. of Textron v. Local 516*, 500 F.2d 921, 923 (2 Cir. 1974) ("courts will not enforce an award that is incomplete, ambiguous, or contradictory"). The court will adhere to the teaching of these decisions when reviewing this contention.

The owner claims that the award is inconsistent, in particular the award of $118,-692.80 for excess fuel consumed by the vessel in the following respects:

> 1. The owner points out that evidence presented by the charterer indicates performance by the "ATKI" better than that warranted in clause 56 of the charter party.
>
> 2. Clause 56 should have been construed by the panel to sanction the use of diesel and/or high viscosity fuel oil.
>
> 3. A significant inconsistency is demonstrated by the panel's award of $118,-692.80 to the charterer for excess fuel consumed while, at the same time, the panel awarded the owner a set off of $42,311.74 for superior performance by the vessel.

In light of these purported inconsistencies, owner argues that the court should vacate the award in accordance with the instruction of § 10(d).

In response to the points noted above, charterer urges that the award is not so irrational or inconsistent as to require re-versal. To support this proposition, charterer shows the court that its evidence indicates that the "AKTI" log sheets concerning fuel consumption had been falsified—the charterer documented via invoices that the "AKTI" substituted diesel for the fuel oil specified in clause 56. Because of these false entries, it was impossible to reconstruct the actual performance of the "AKTI". For this reason, charterer paid the owner additional hire for purported superior performance in light of the fact that the vessel had consumed excessive amounts of diesel. In other words, since documentation of the actual performance could not be done and relying on the evidence submitted by the parties, the arbitrators awarded a sum for "additional hire" to the owner and a larger sum for "excessive diesel consumed" to the charterer in hopes of approximating the actual situation.

The gravamen of owner's contention involves a question of contract interpretation and construction by the panel; the arbitrators, in a split vote, construed clause 56 to not sanction the consumption of diesel *or* high viscosity fuel oil. The courts have uniformly held that decisions of arbitrators concerning the construction of the contract are not subject to judicial review. *Bernhardt v. Polygraphic Co. of America*, 350 U.S. 198, 76 S.Ct. 273, 100 L.Ed. 199 (1956). For instance in *I/S Stavborg v. National Metal Converters, Inc.*, 500 F.2d 424 (2 Cir. 1974), the court noted that:

> All of appellant's claims here reduce to the proposition that the arbitrators misconstrued the contract. The arbitral majority justified reading clause 8 out of the charter party by considering clause 1 to conflict with it and then by placing heavy reliance on the August 30 letter from appellant's president * * * We see no basis, however, to reverse the award even though it is based on a clearly erroneous interpretation of the contract. Whatever arbitrators' mistakes of law may be corrected, simple misinterpretations of contracts do not appear one of them. *Id.* at 431–432.

The court has carefully reviewed the separate opinions filed by the members of the panel and the pertinent clauses of the charter party. Although the court finds the logic of arbitrator Gladstone intriguing, in particular his construction of clause 56, it is not the duty of this Court to second guess or use its own limited experience in a complex area to set aside the award. The court will honor the construction placed on the charter party by the majority of the panel and will not disturb the award on this account. Accordingly, the court finds that the award is not so inconsistent, ambiguous, and irrational as to exceed the bounds and spirit of the agreement and require the court to vacate the award.

## II.  PROCEDURAL MISCONDUCT

■ The owner bottoms his second attack on the decision on the failure of the panel to issue a subpoena directing Mr. O'Hanlon, a witness for the charterer, to appear for cross examination and, in the alternative, failing to strike the testimony of this witness when the owner did not have the opportunity to cross examine him. The affidavits reveal that Mr. O'Hanlon served as Group Head of the Performance and Demurrage Section, Fleet Services Division, Supply and Transportation Department of Exxon International, Inc.; he testified at the second hearing held on November 13, 1973. Since the owner's representative did not appear at that hearing, Mr. O'Hanlon was not subjected to cross examination.

Some time later, Mr. O'Hanlon contracted hypertension. He received extended sick leave from Exxon and his doctor directed that he avoid tension or strenuous activity. At the seventh hearing on June 25, 1974, the owner's representative requested the panel to subpoena Mr. O'Hanlon. The charterer, in July of 1974, produced Mr. Karle for cross examination in lieu of O'Hanlon; Karle had supervised the preparation of documents signed by Mr. O'Hanlon, Karle's immediate superior, and presented to the panel during O'Hanlon's testimony on direct. The record reveals that the owner's representative cross examined Mr. Karle for four full hearings. In addition, the undisputed facts indicate that O'Hanlon, after returning to work but still under doctor's order to avoid strain answered a series of written interrogatories propounded by the owner's representative. Based on these facts, the owner contends that the actions of the panel can be characterized as "misconduct" which required a vacation of the award under § 10(c) of the Act.

Cases like *Chambers v. Mississippi,* 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973), and *Smith v. Illinois,* 390 U.S. 129, 88 S.Ct. 748, 19 L.Ed.2d 956 (1966), illustrate that the right to cross examination is sacrosanct in judicial proceeding especially criminal prosecutions. However, arbitrators are not bound by strict rules of evidence and procedure. In reference to this point, the court in *Transport Workers Union v. Philadelphia Transportation Co.,* 283 F.Supp. 597 (E.D.Pa.1968), noted that:

Although arbitration hearings are of a quasi-judicial nature the prime virtue of arbitration is its informality, and it would be inappropriate for courts to mandate rigid compliance with procedural rules . . . *Id.* at 600.

To amount to a procedural error which mandates vacation of the award, the actions of the panel must deprive the defendant of a fair hearing when *viewed as a whole. Newark Stereotypers' Union No. 18 v. Newark Morning Ledger,* 397 F.2d 594 (3 Cir. 1968), *cert. denied,* 393 U.S. 954, 89 S.Ct. 378, 21 L.Ed.2d 365 (1969).

In light of the efforts by the charterer to accommodate the owner by proffering Mr. Karle in lieu of Mr. O'Hanlon and the opportunity of the owner to submit written interrogatories to O'Hanlon, the court concludes that the owner was not deprived of a fair hearing when viewed as a whole. This conclusion is buttressed by the fact that the owner could have cross examined O'Hanlon on November 13, 1973, but for the absence of its representative. For these reasons, this argument does not require the court to vacate the decision. *See Treharne v. Callahan,* 426 F.2d 58 (3 Cir. 1970); *United States v. Rogers,* 475 F.2d 821 (7 Cir. 1973).

### III. "EVIDENT PARTIALITY"

#### A

As one of its final points of attack, the owner claims that in the words of the Act the actions and conduct of the arbitrator appointed by the charterer before and during the pendency of the proceedings constituted "evident partiality" toward his nominator's interest. As a result of this prejudice, the owner insists that the award of over $187,000 in the charterer's favor is tainted and should be vacated. In advancing this argument, owner relies on *Commonwealth Coatings Corp. v. Continental Cas. Co.*, 393 U.S. 145, 89 S.Ct. 337, 21 L.Ed.2d 301 (1969); in opposing this claim of evident partiality, charterer seeks to distinguish *Commonwealth Coatings* and relies heavily on the rational of *Astoria Medical Group v. Health Insurance Plan of Greater New York*, 11 N.Y.2d 128, 227 N.Y.S.2d 401, 182 N.E.2d 85 (1962) and *Stef Shipping Corp. v. Norris Grain Co.*, 209 F.Supp. 249 (S.D.N.Y.1962). The facts surrounding this claim are not in dispute; what is at issue is the legal implications which flow from these facts.

Pursuant to clause 53 of the charter party, the charterer selected as an arbitrator a member of the law firm of Bingham Englar Jones & Houston, J. Bond Smith, a maritime attorney who has sat as an arbitrator on numerous panels. At the initial meeting of the three arbitrators on October 23, 1974, Mr. Smith revealed that his firm had handled actions for and against the Exxon corporation, the sole stockholder of the charterer. Smith further disclosed that his firm had also litigated against Cape Shipping Limited, agents for the owner.

In a letter bearing the date of October 30, 1973, Cape Shipping asked Mr. Smith to survey his firm's records and determine the extent of his firm's representation of or connection with the Exxon group of companies. Mr. Smith's letter of November 2, 1973, and his affidavits submitted subsequently detail that his firm had represented Exxon in two proceedings during the last few years, one action ongoing at the time the arbitration started. However, Mr. Smith carefully noted that he did not personally supervise or assist in the Exxon litigation. On November 7, 1973, by letter, the representative for the owner lodged a complaint as to Smith's qualifications to sit on the panel in view of his "attorney-client relationship" with the Exxon corporation and by a later communication asked that the next meeting of the arbitrators be continued to November 13, 1973. The panel complied with that request. On that date, the representative for the owner did not appear; the arbitrators then decided to take the oath and commence the hearings.

Smith's affidavits and his statement at the initial meeting of the arbitrators disclose his firm's contacts with the parties interested in the proceedings as follows:

1. His *firm* has represented Exxon in the AFRICAN STAR litigation and the Bayway refinery explosion litigation. The latter action was pending at the time this arbitration was begun. However, underwriters of Exxon paid the retainers for the Bayway litigation.

2. On one occasion, Smith served as the sole arbitrator in a charter party dispute involving the charterer. He decided that dispute in favor of the charterer.

3. The facts recited in his affidavits indicate that his firm has disposed of three actions against the charterer; he participated in at least one of those actions.

4. At the time he prepared his August, 1976, affidavit, his firm was involved in two pending actions against corporate members of the Exxon conglomerate.

5. Smith has personally handled two actions against Cape Shipping Limited, the agents for the owner.

An affidavit submitted by Smith in February of 1977 with respect to the Bayway refinery and AFRICAN STAR litigations explains that: "I can state unequivocally that I personally did not have any involvement in either litigation. I am not and have never been involved in casualty litigation of that sort and those matters were handled entirely by other members of my firm." From these relationships or con-

tacts, the defendant urges that the court should find a continuing attorney-client relation between the Exxon corporations and the firm to which Smith belongs which mandates a finding of "evident partiality".

Since the parties place weight on the United States Supreme Court decision in *Commonwealth Coatings Corp. v. Continental Casualty Co., supra,* a close examination of that decision is warranted. In that case, the court broke down into a 4–2–3 pattern (two justices concurring and three dissenting) with Justice Black writing the lead opinion. Because of this split, the concurring opinion authored by Justice White assumes critical importance.

In *Coatings,* a subcontractor sued the surety of the prime contractor to recover money due on a painting contract. The agreement between the parties specified that certain disputes would be reviewed by a tripartite arbitration panel. After an award in favor of the prime contractor, the subcontractor attempted to vacate the award pursuant to 9 U.S.C. § 10(b) on the ground that the third or "neutral" arbitrator's actions in failing to disclose significant contacts with the prime contractor before the commencement of the arbitration constituted "evident partiality". The facts suggested that the "neutral" arbitrator and the prime contractor had sporadic dealings; however, these contacts did involve the matter before the panel and did render the arbitrator fees of $12,000 over a period of four years prior to the arbitration.

Faced with these facts, the court vacated the award and explained the result as follows:

> We can perceive no way in which the effectiveness of the arbitration process will be hampered by the simple requirement that arbitrators disclose to the parties any dealings that might create an *impression of possible bias.* * * *
> We cannot believe that it was the purpose of Congress to authorize litigants to submit their cases and controversies to arbitration boards that might reasonably be thought biased against one litigant and favorable to another. *Id.,* 393 U.S. at

149–150, 89 S.Ct. at 339–340 (Emphasis added)

In the concurring opinion, Justice White couched the courts holding in the following language:

> But it is enough for present purposes to hold, as the Court does, that where the arbitrator has a substantial interest in a firm which has done more than trivial business with a party, that fact must be disclosed. If arbitrators err on the side of disclosure, as they should, it will not be difficult for courts to identify those undisclosed relationships which are too insubstantial to warrant vacating an award. *Id.* at 151, 152, 89 S.Ct. at 340, 341

The owner, loser in the arbitration, seeks to extend this disclosure rational to the case at bar. In its memoranda, the owner harps on the impression or appearance of bias language cited above.

Relying on the language in clause 53 of the agreement that New York law should control the disposition of this action if applicable, charterer cites the decisions of *Astoria Medical Group, supra,* and *Stef Shipping Corp., supra, Astoria Medical Group* involved a proceeding to disqualify a person nominated as arbitrator in a tripartite arbitration on account of his relationship to the defendant as a member of the defendant's board of directors. The New York court denied the challenge and stated that:

> In the light of accepted practice, which sanctions and contemplates two non-neutral arbitrators on a tripartite board, the parties must be deemed to have intended that each was to be free to appoint any arbitrator desired, however close his relationship to it or to this dispute. Moreover, this conclusion is reinforced by the fact that the provision relating to arbitration contains no word of limitation on the identity, status or qualifications of the arbitrators; had the parties intended that their appointees be completely impartial or disinterested, they could have readily so provided. * * *
> If they choose to have their disputes resolved by a body consisting of two parti-

san arbitrators, and a third neutral arbitrator, that is their affair. We may not rewrite their contract. *Id.*, 227 N.Y.S.2d at 406, 182 N.E.2d at 88.

In *Stef*, in a motion to vacate posited under 9 U.S.C. § 10(b), the court denied the challenge based on prejudice, followed the New York decision in *Astoria Medical Group*, and held that:

More recent pronouncements on the conduct of arbitrators are somewhat more realistic. They recognize that in a tripartite arrangement, where each party to a dispute is given the right to select an arbitrator and the third member is selected by them or by a disinterested party, the arbitrator selected by the disputants cannot be expected to play a wholly impartial part. *They are partisans once removed from the actual controversy. Id.* at 253. (Emphasis added)

These two decisions form the bulk of the charterer's response.

Despite the language in clause 53 referring to choice of New York law if applicable, the court is not prepared to blindly follow the decisions cited by the charterer. The view that Congress contemplated when enacting the Act that the parties would appoint partisan arbitrators is rebutted by the express language of § 10(b). That section provides that the court shall vacate the award, "Where there was evident partiality or corruption in the arbitrators, or *either of them*". (Emphasis added) This underlined language directs that the evident partiality test should apply to every member of the panel. Charterer's argument that *Commonwealth Coatings* does not apply to the case at bar because that decision involved only the third or neutral arbitrator is without merit; neither the lead or concurring opinion delimits the holding in such a manner. In light of the statutory language set forth above, charterer's contention that the rational of *Astoria Medical Group* controls is equally without merit. This is a proceeding under the Federal Arbitration Act and federal decisional law governs. *Litton RCS, Inc. v. Pennsylvania Turnpike Commission,* 376 F.Supp. 579 (E.D.Pa.1974),

*aff'd*, 511 F.2d 1394 (3 Cir. 1974) (when state law contravenes the express provisions of this title, state law must fail).

Nonetheless, the court believes that *Commonwealth Coatings* does not require the court to vacate the award. That decision is distinguishable on two grounds: first, the third arbitrator's relationship with a party in the proceeding involved the actual matter before the panel; second, *Coatings* only placed a *disclosure* burden on arbitrators appointed by the parties or otherwise. *Coatings* did not involve the situation at bar where the arbitrator before taking his oath disclosed on the record his personal and his law firm's involvement with the parties. In light of these distinguishing factors, this Court finds that *Commonwealth Coatings* standing alone does not warrant the reversal of the award.

By distinguishing *Coatings*, the court does not foreclose further analysis. The standard for reviewing Smith's position as arbitrator is that of "evident partiality". The court is not confronted with a situation where the language "appearance of bias or partiality" is used. *See SCA Services Inc. v. Morgan,* 557 F.2d 110 (7 Cir. 1977) (the appearance of partiality language in 28 U.S.C. § 455 requires a district court judge to recuse when his brother's firm tries a case before the court even though the judge's brother does not actively appear in the case). The court has yet to locate a decision which defines "evident partiality" as that term is used in the Act in view of the facts at hand. *See* Annot. Interest or Bias of an Arbitrator, 56 A.L.R.3d 697 (1974). The principal duty thrust upon the court is to "scan the record" for indicia of evident partiality. *Saxis S. S. Co. v. Multifacs International Traders, Inc.,* 375 F.2d 577 (2 Cir. 1967).

The owner would argue that the relationships and contacts with the parties described above, representing clients in actions against the owner's agent and deciding a prior dispute in charterer's favor, standing alone constitute evident partiality. The court disagrees with this assertion. J. Bond Smith or members of his firm have repre-

sented clients in actions for and against the Exxon group and its subsidiary Standard Tankers. This fact concomitant with the fact that Smith's firm includes greater than twenty attorneys and that he was not directly involved in the legal decisions regarding the majority of the actions described above substantiate the conclusion that these "relationships" do not satisfy the statutory prerequisite. To constitute evident partiality, some overt misconduct or demonstration of partiality is required. *See Overseas Private Investment Corp. v. Anaconda Co.,* 418 F.Supp. 107 (D.C.D.1976).

The court has carefully scanned and scrutinized the record at hand. No indicia of partiality can be found except the obvious indication of agreement with the charterer's position—Smith's vote for the charterer. However, a reading of Smith's opinion filed in support of his vote shows that it is based on reason and fact and, accordingly, it can not be characterized as evidently partial.

In light of the foregoing, the court arrives at the conclusion that no overt misconduct or evident partiality appears in the record. Therefore, the court concludes that Smith and his firm's prior professional contacts and actions do not constitute "evident partiality" and that the award should not be vacated on this ground.

### B

As another indication of "evident partiality", the owner contends that the ownership of Exxon stock by the two arbitrators who voted for the plaintiff and the failure of the arbitrators to disclose this ownership require the court to vacate the award. The record indicates that the chairman of the panel, Stonebridge, became the owner of fifty shares of Exxon stock on December 7, 1973, and that he disclosed ownership on June 17, 1975. Smith first learned of Exxon stock ownership, forty-one shares, on April 30, 1975; he disclosed this fact on June 11, 1975. Because of the vast number of shares issued by Exxon at this time, greater than 226,000,000 shares outstanding, the court finds that the ownership of the shares should not be characterized as an encroachment on the provisions of § 10(b). Furthermore, in *Coatings* the court indicates that an "arbitrator has a substantial interest in a firm which has done more than trivial business with a party" before he need disclose. *Id.,* 393 U.S. at 151, 89 S.Ct. at 340, 21 L.Ed.2d at 306. The ownership by Smith and Stonebridge of such a small number of shares in a corporation with such a vast number of outstanding shares of stock certainly falls within the ambit of the cited language. For these reasons, the court concludes that this final contention does not merit further consideration.

### CONCLUSION

While scrutinizing the merits of the pending motions, the court has been cognizant of the policy embodied in the Federal Arbitration Act: to encourage arbitration of disputes arising in maritime practice and to eliminate extended court proceedings. Following the spirit of the Act, the court has carefully reviewed the history of this arbitration and the panel's result. In light of the discussion set forth above, the court in the following ORDER will deny the owner's motion to vacate the award and will allow the charterer's motion to confirm the award. This result reinforces the spirit of the Act and follows closely the letter of 9 U.S.C. § 10(a)–(e).

### ORDER

NOW THEREFORE, in accordance with the foregoing, it is

ORDERED that the defendants' motion to vacate the arbitrators' award be, and the same is hereby DENIED;

FURTHER ORDERED that the plaintiff's motion to confirm the arbitrators' award be, and the same is hereby ALLOWED;

FURTHER ORDERED that this case be, and the same is hereby DISMISSED;

FURTHER ORDERED that the Clerk shall serve a copy of this MEMORANDUM OPINION and ORDER upon all counsel of record.

LET THIS ORDER BE ENTERED FORTHWITH.