**In re I/S STAVBORG (O. H. MELING, MANAGER), Petitioner-Appellee,**

v.

**NATIONAL METAL CONVERTERS, INC., Respondent-Appellant.**

No. 633, Docket 73–2491.

United States Court of Appeals, Second Circuit.

Argued March 6, 1974.

Decided May 24, 1974.

Herbert F. Roth, New York City (Finley, Kumble, Heine, Underberg & Grutman, New York City, of counsel), for respondent-appellant.

John J. Reilly, New York City (Parker S. Wise, Jr., Haight, Gardiner, Poor & Havens, New York City, of counsel), for petitioner-appellee.

Before MOORE, MANSFIELD and OAKES, Circuit Judges.

OAKES, Circuit Judge:

National Metal Converters, Inc., appeals from an order entered August 2, 1973, by the district court granting I/S Stavborg's motion to confirm a 2–1 arbitration award made May 3, 1973, in New York City. Appellant raises two main issues on this appeal: (1) whether the district court had jurisdiction to enter judgment on the award under the Federal Arbitration Act, 9 U.S.C. § 1 et seq., when the parties did not explicitly agree to the entry of judgment on an award in the arbitration agreement; and (2) whether the decision of the majority of the arbitrators should be reversed on grounds of its being either "clearly erroneous" or "manifestly in disregard" of the applicable law. We find that the district court did have jurisdiction to enter judgment on the award, and, not without some doubt, affirm the award.

## I. JURISDICTION OF THE DISTRICT COURT.

On August 8, 1972, appellant, as charterer, agreed to charter a vessel owned by appellee to transport bulk scrap steel from Bath, Maine, to Bilbao, Spain. Clause 37 of the contract of charter party entered into by the parties, governing the arbitration of disputes, reads as follows:

Any and all differences and disputes of whatsoever nature arising out of this Charter, shall be put to arbitration in the City of New York pursuant to the Laws relating to arbitration there in force, before a board of three persons consisting of one arbitrator to be appointed by the Owners [appellee], one by the Charterers [appellant], and one by the two so chosen. The decision of any two of the three on any point or points shall be final.

After the steel had arrived in Spain, a dispute arose concerning the payment of freight due under the charter party agreement; this dispute was submitted to arbitration in New York City. Both parties apparently agreed to submit the dispute to arbitration under clause 37, as no court action was brought to enforce that clause. Both parties appointed one arbitrator. Both parties agreed (presumably because the two appointed arbitrators were unable to agree) to the appointment of a third arbitrator by the district court below and accepted that court's appointee. Both parties participated fully in the arbitration itself, including the submission of briefs, calling of witnesses and presenting of argument to the arbitrators. After an award for appellee had been handed down, appellant petitioned the district court to modify or vacate that award pursuant to 9 U.S.C. § 9. Only on this appeal does appellant raise, for the first time, the question whether the district court had jurisdiction to enter judgment on the award. Appellant relies primarily on this court's recent decision in Varley v. Tarrytown Associates, Inc., 477 F.2d 208 (1973). Since we agree with appellee that the language of clause 37, coupled with the conduct of appellant here,[1] was sufficient to confer jurisdiction on the district court to enter judgment on the

---

1. We need not decide whether language of clause 37, standing alone, would have been sufficient to confer jurisdiction on a federal district court had either party resisted arbitration, thus forcing the other party to attempt to compel arbitration under 9 U.S.C. § 4.

award pursuant to 9 U.S.C. § 9, we do not consider the alternative argument advanced by appellee on the basis of the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, 9 U.S.C. § 201 et seq.[2] The fact that the question was raised for the first time on appeal is immaterial since the jurisdiction of the federal district court is at stake. *See e. g.*, United States v. Heyward-Robinson Co., 430 F.2d 1077, 1080 (2d Cir. 1970), cert. denied, 400 U. S. 1021, 91 S.Ct. 582, 27 L.Ed.2d 632 (1971).

█ As this court stated in *Varley*, 477 F.2d at 210, the language of 9 U.S. C. § 9 is quite specific in requiring an agreement by the parties to entry of judgment by a federal court before a federal court has jurisdiction to do so; section 9 states that a federal district court may confirm an arbitration award "If the parties in their agreement have agreed that a judgment of the court shall be entered upon the award made pursuant to the arbitration. . . ." One purpose of this provision is to ensure that the parties have affirmatively agreed to the application of the federal substantive law contemplated by the Act to the interpretation of the arbitration agreement into which they have entered. *See* Coenen v. R. W. Pressprich & Co., 453 F.2d 1209 (2d Cir.), cert. denied, 406 U.S. 949, 92 S.Ct. 2045, 32 L.Ed.2d 337 (1972). *See generally* Note, The Consequences of a Broad Arbitration Clause under the Federal Arbitration Act, 52 B.U.L.Rev. 571, 589–596 (1972).

█ It is true that clause 37 does not contain any *explicit* agreement by the parties to entry of judgment on an arbitral award. The question for us is whether that omission precludes the implication, from conduct, of consent to such entry. *Varley*, of course, did not

hold that consent must be *explicit* within the arbitration clause itself or even in some document incorporated therein by reference. In *Varley*, the arbitration clause provided that disputes under the contract "shall be settled by arbitration pursuant to the rules of the American Arbitration Association." 477 F.2d at 209. The appellee in *Varley* attempted to argue that consent to entry of judgment was made out for purposes of 9 U. S.C. § 9 by the reference to the "rules" of the American Arbitration Association (AAA). This court acknowledged in *Varley*, as it had previously in Reed & Martin, Inc. v. Westinghouse Electric Co., 439 F.2d 1268 (2d Cir. 1971), that such "rules" could be incorporated into an arbitration clause, thereby establishing the requisite "consent" of the parties to entry of judgment, if the "rules" so provided. The problem for appellee in *Varley* was that the "rules" there made no reference whatsoever to entry of judgment; indeed, the AAA had recommended that a separate and distinct clause be written directly into the arbitration agreement to achieve that purpose.

Clause 37 contains two provisions bearing on the question. The first is that arbitration was to be conducted in the City of New York "pursuant to the Laws relating to arbitration there in force . . . ." The second is that "The decision of any two of the three [arbitrators] . . . shall be final." From the first, it may be implied that both parties—particularly appellee here, a foreign corporation—had consented both to arbitrate in New York City and to be served with process in New York to enforce any arbitral award that might be forthcoming. Thus, the provision. would have protected appellant if, *inter alia*, appellee had refused to submit to

2. The commentators appear to be in disagreement on this question: McMahon, Implementation of the United Nations Convention on Foreign Arbitral Awards in the United States, 2 J.Mar.L. & Comm. 735, 740–742 (1971) (Convention applies to awards made in United States); Asken, American Arbitration Accession Arrives in the Age of Aquarius: United States Implements United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards, 3 Sw.U.L.Rev. 1, 6 (1971) (Convention applicable only to awards made in foreign countries).

arbitration.[3] The second clause clearly expresses the intent of the parties that the arbitrators' decision as expressed in the award was to be "final." Whatever "final" means, it at least expresses the intent of the parties that the issues joined and resolved in the arbitration may not be tried de novo in any court, state or federal. Thus, the only point left open for conjecture by clause 37 is whether the parties intended for judgment to be entered in a federal, as opposed to a state, court. Where, as here, the substantive law to be applied to interpretation of the contract itself is federal maritime law, it seems doubtful to us that either party was particularly concerned that an award might be enforced in federal court: their main concern was that the award should be "final."

Whatever doubt remains as to the intent of the parties from the language of clause 37, that doubt is removed by the conduct of the parties to this case as recounted above. At an early stage, the power of a federal court was invoked to secure the appointment of the "third" arbitrator. After arbitration, appellant moved in federal district court under 9 U.S.C. § 9 to vacate and/or modify that award. Under these circumstances, it seems abundantly clear to us that both parties in fact consented to the entry of judgment on any arbitral award entered, and this was sufficient to permit the exercise of jurisdiction by the district below.

## II. REVIEW OF THE ARBITRAL AWARD.

■ Appellant's other claims may be stated variously that the arbitrators' decision was "clearly erroneous," or was "in manifest disregard of the applicable law," or amounted to a "reformation" of the charter party agreement. Although interpretation of the charter party agreement here in issue is clearly a matter of federal maritime law, "the charter party is merely a contract, subject in general to all the rules and requirements of contract law." G. Gilmore & C. Black, The Law of Admiralty 172 (1957). The same authors have also observed that "a single short (and often, to the uninitiate, obscure) expression may refer to a whole set of complicated practices perfectly familiar to those who deal regularly in such matters . . .," id., and they conclude that "In such a field, it is not surprising that arbitration . . . has largely taken the place of litigation." Id. at 173 (footnote omitted).

As is the usual charter party case, id., the charter party here was negotiated by brokers for both appellant and appellee. The facts surrounding the voyage itself were not in dispute before the arbitrators. The vessel, owned by appellee, left Bath, Maine, on or about August 17, 1972, carrying 4,091.95 long tons of bulk scrap steel. The steel was consigned to one Rosal, "F.O.B. stowed vessel." Under the charter party, freight was due to be paid by August 24, 1972, with Rosal having the *initial* obligation to pay the freight.[4] Rosal did not pay the freight by that date, nor had it been paid at the time of arbitration. The parties agree that the balance of the unpaid freight is $32,742.61.

The vessel arrived at Bilboa, Spain, on or about August 27, 1972. Discharge of the cargo commenced on August 28, 1972. Under date of August 30, 1972, some hours prior to the completion of the discharge of the cargo, the president of appellant charterer wrote its broker a letter and enclosed a check to cover freight "as good faith of our guarantee in the event freight payment is not received from Rosal. . . ." At some point prior to completion of the

---

3. This would clearly be true even if appellant had sought to have the award enforced in New York state courts. *See, e. g.*, Samincorp South American Minerals & Merchandise Corp. v. Tikvah Mining Co., 43 Misc.2d 27, 250 N.Y.S.2d 151 (Sup.Ct.1964).

4. A bill of lading designating Rosal as the consignee and containing the clause "Freight prepaid as per charter party" was issued prior to sailing but both parties here conceded at arbitration that the freight had not in fact been prepaid.

cargo discharge on August 31, 1972, the charterer requested that the discharge be discontinued because of Rosal's failure to pay the freight. Rosal's failure to pay was a fact known or that should have been known to the owner appellee because a typewritten addition to the charter party stated "Freight to be paid to Den Norske Creditbank, Stavanger, Norway, account O. H. Meling [appellee]." [5]

In dispute below, then, was the responsibility for the payment of freight in a situation where the consignee, Rosal, had failed to make it. Appellant contended that it was the intent of the parties that the charterer was obligated to pay only to the extent the owner was unable to obtain payment by exercise of its lien. Appellant relies on clause 8 of the charter party, which reads in pertinent part as follows:

> Owners [appellee] shall have a lien on the cargo for freight . . . Charterers [appellant] also remain responsible · for freight . . ., *but only to such extent as the Owners have been unable to obtain payment thereof by exercising the lien on the cargo.*

(Emphasis added.)

The clear import of this clause, taken alone, is that appellant remained responsible for payment of freight only to the extent that the appellee was unable to recoup freight by means of execution of the lien it held on the cargo. As a practical matter, this clause would cast the burden of taking affirmative action to secure payment of the freight due upon the only party to the agreement guaranteed to have a representative at the scene where the cargo is discharged (the owner's ship's captain). Despite this clause, the owner, aware of the fact that

the freight was not prepaid and that the consignee was "initially obligated to pay the freight," did not seek to obtain payment by exercise of its lien on the cargo.

Appellee argues, and the majority of the arbitrators apparently found, that clause 1 of the charter party contradicts clause 8 and therefore the true intent of the parties must be otherwise ascertained. Clause 1 in pertinent part reads as follows:

> Freight to be telegraphically remitted to Owners by Messrs. Rosal E. Madrid, the Receivers. *Charterers to remain fully responsible for fulfillment of charter party.*

(Emphasis added.)

The arbitral majority speaks of "contradictions" in the charter party (presumably between clauses 1 and 8) and goes on to point out that "under Spanish law the master may not delay unloading the cargo because the freight has not been paid. He must complete discharge and then, *if he desires,* he can petition the Court to put the cargo under lien." [6] (Emphasis added.) But Spanish law, which would *permit* a lien to arise after discharge apparently even in the absence of a charter party agreement to that effect, is not at all inconsistent with clause 8.

The arbitral majority then went on to inquire whether the master, after discharge, should have complied with clause 8 (by instituting lien proceedings in the Spanish courts) "in the face of a bill of lading which stated the freight had been paid?" In light of their previous finding that both parties were quite aware that the freight had not been prepaid, *see* note 4 *supra,* we fail to see any relevance the bill of lading might have to the obligation of appellee under clause

5. Remaining on the printed charter party from was a phrase that contradicted the arrangement above, but the typewritten addition plainly controls.

6. The majority opinion followed this statement with the sentence "In this case, Rosal

held a bill of lading which stated the freight had been prepaid." The majority already having stated that this bill of lading was known by all parties to be incorrect in this respect, *see* note 4 *supra,* its treatment of the bill of lading is difficult to comprehend.

8.[7] As we view it, the majority, in effect, read clause 8 out of the charter party.

 It seems rather anomalous, but had the arbitral majority failed to render a written opinion in this case, our ability—ignoring the question of our power—to review that decision would be greatly limited. See Sobel v. Hertz, Warner & Co., 469 F.2d 1211, 1214–1215 (2d Cir. 1972).[8] Indeed, the AAA apparently discourages the practice of written arbitral opinions in order to insulate the arbitral process from any judicial review.[9] Faced, however, with a reasoned opinion that is, in our view, clearly erroneous both in logic and result, we are confronted with the question whether it is nevertheless our obli-gation under the Federal Arbitration Act to affirm the award.

 As was stated in Sobel, supra, "the extent of an arbitrator's obligation to explain his award is necessarily related to the scope of judicial review of it." 469 F.2d at 1214. The Sobel court did not go so far as to say that where arbitrators voluntarily submit written opinions, they subject themselves to more thorough review by the courts; review in the federal courts is still governed by the provisions of the Federal Arbitration Act, 9 U.S.C. §§ 10 & 11.[10] Appellant's briefs before this court significantly contain not so much as a passing reference to 9 U.S.C. § 10, which is the only provision of the Act which is relevant to our scope of review. That section, reprinted below,[11] exhausts the

---

7. The dissenting arbitrator took the view that the bill of lading should not be read as indicating that the freight had been prepaid because it reads "Freight Prepaid as per Charter Party," and the charter party itself clearly indicated that the freight had *not* been prepaid.

8. This problem was dealt with early in this history of the Republic by Mr. Justice Story, who, sitting as Circuit Justice, was careful to preserve the distinction between scope of review, *on the one hand*, and the problems created by the presence or absence of a written opinion by the arbitrators in cases where questions of law had been preserved for the court. In Kleine v. Catara, 14 Fed. Cas. p. 732 (No. 7,869) (C.C.D.Mass.1814), Story stated that, "under an unqualified submission," if the parties mean for the arbitrators "to take upon themselves the whole responsibility, and not to refer it to the *court, to decide differently from what the* court would on a point of law, the award ought not to be set aside." *Id.*, at 735. *Kleine* was, however, a case in which the parties had agreed that the arbitrators should "decide according to law, and [were the arbitrators to make a] mistake," that mistake was to be referred to the court for its review. Dealing with the case in which power to review questions of law had been preserved, Story observed that, in the absence of a reasoned opinion by the arbitrators, "it would have deserved very grave consideration, whether we could, by collateral evidence, have examined into the existence of any errors of law." *Id.* The Justice then held that, where the arbitrators had given the grounds for their decision (some-thing he did not recommend highly), their decision *"once before the court, . . . must stand or fall by its intrinsic correctness, tested by legal principles." Id.* at 736 (emphasis added).

9. *See* Note, Commercial Arbitration: Expanding the Judicial Role, 52 Minn.L.Rev. 1218, 1231 n. 109 (1968).

10. Appellant suggests that this court has power to vacate the award under 28 U.S.C. § 2106, the general Judicial Code section relating to appellate review, if such an action would "be just under the circumstances." That provision, however, can hardly be thought to expand the scope of review specifically tailored by 9 U.S.C. §§ 10 & 11 to the review of arbitral awards under the Federal Arbitration Act.

11. In either of the following cases the United States court in and for the district wherein the award was made may make an order vacating the award upon the application of any party to the arbitration—

(a) Where the award was procured by corruption, fraud, or undue means.

(b) Where there was evident partiality or corruption in the arbitrators, or either of them.

(c) Where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced.

(d) Where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award

grounds upon which the district court, or this court on appeal, may disturb the arbitral award. Appellants do not advance any colorable claim under subsections (a), (b) or (c); we are left to consider whether their claim falls under subsection (d).

Appellant argues that an arbitral award may be modified if that award either "manifestly disregards the law," citing Wilko v. Swan, 346 U.S. 427, 74 S.Ct. 182, 98 L.Ed. 168 (1953), or is "irrational," citing this court's per curiam decision in Marcy Lee Manufacturing Co. v. Cortley Fabrics Co., 354 F.2d 42 (1965), in which the panel referred to federal law as being the same as New York law on the subject.[12]

In Wilko v. Swan, *supra*, the Court was presented with the narrow question whether certain provisions of the Securities Act of 1933 invalidated a stipulation in which a purchaser of securities agreed to settle any differences arising out of the purchase by recourse to arbitration. The Court, in answering this question in the affirmative, seemed to say, though it clearly did not decide, that a decision by an arbitrator disregarding the applicable securities laws would have been reversible under 9 U.S.C. § 10 when it stated that

> While it *may* be true . . . that a failure of the arbitrators to decide in accordance with the provisions of the Securities Act would "constitute grounds for vacating the award pursuant to section 10 of the Federal Arbitration Act," that failure would need to be made clearly to appear. In unrestricted submissions . . . the interpretations of the law by the arbitrators in contrast to manifest disregard are not subject, in the federal courts, to judicial review for error in intepetation.[13]

346 U.S. at 436–437 (emphasis added) (footnote omitted). It was Justice Frankfurter, dissenting in *Wilko*, who emphasized that "Arbitrators may not disregard the law." *Id.* at 440.[14] In any event, this court, citing simultaneously both the *Wilko* majority and dissenting opinions on the point, embraced the "manifest disregard" test, saying, however, that it is an "exception" that must be "severely limited." *See* Trafalgar Shipping Co. v. International Milling Co., 401 F.2d 568, 573 (2d Cir. 1968); Saxis Steamship Co. v. Multifacs International Traders, Inc., 375 F.2d 577, 582 (2d Cir. 1967). *See also* Office of Supply, Republic of Korea v. New

> upon the subject matter submitted was not made.
> (e) Where an award is vacated and the time within which the agreement required the award to be made has not expired the court may, in its discretion, direct a rehearing by the arbitrators.
> 9 U.S.C. § 10.

12. The *Marcy* court essentially quoted the New York Court of Appeals decision in In re Exercycle Corp., 9 N.Y.2d 329, 336–337, 214 N.Y.S.2d 353, 357–358, 174 N.E.2d 463, 466 (1961). That decision in turn relied for its "irrationality" proposition on In re National Cash Register Co., 8 N.Y.2d 377, 383, 208 N.Y.S.2d 951, 955, 171 N.E.2d 302, 305 (1960), where the Court of Appeals said that arbitrators may be said to have "exceeded their powers" under § 1462(4) of the New York Civil Practice Act "only if they gave a completely irrational construction to the provisions in dispute and, in effect, made a new contract for the parties." The language of 9 U.S.C. § 10(d) tracks the language of § 1462(4) exactly.

13. The latter sentence, ungrammatical in structure, was unnecessary to the decision as Justice Jackson, concurring pointed out. 346 U.S. at 438–439. How courts are to distinguish in the Supreme Court's phrase between "erroneous interpretation" of a statute, or for that matter, a clause in a contract, and "manifest disregard" of it, we do not know: one man's "interpretation" may be another's "disregard." Is an "irrational" misinterpretation a "manifest disregard"?

14. Justice Frankfurter went on to say that "appropriate means for judicial scrutiny must be implied, in the form of some record or opinion, however informal, whereby such compliance [with the statute] will appear, or want of it will upset the award." *Id.* This very clearly is not now the law in this circuit, Sobel v. Hertz, Warren & Co., *supra*, though which came first, the chicken of no judicial review or the egg of no record of reasons which can be judicially reviewed, remains a bit of a mystery.

York Navigation Co., 469 F.2d 377, 379–380 (2d Cir. 1972).

Illustrative of the difficulty inferior courts are having in "attempts to define 'manifest disregard'" is our own Sobel v. Hertz, Warner & Co., 469 F.2d at 1214. The *Sobel* court noted that it "is a truism that an arbitration award will not be vacated for a mistaken interpretation of law . . .," citing Wilko v. Swan to that effect. *Id.* The court then said, "But if the arbitrators simply ignore the applicable law, the literal application of a 'manifest disregard' standard should presumably compel vacation of the award." *Id.* But perhaps the rubric "manifest disregard" [15] is after all not to be given independent significance; rather it is to be interpreted only in the context of the specific narrow provisions of 9 U.S.C. §§ 10 & 11, as Chief Judge Clark's opinion for this court indicated in Amicizia Societa Navegazione v. Chilean Nitrate & Iodine Sales Corp., 274 F.2d 805, 808 (2d Cir.), cert. denied, 363 U.S. 843, 80 S.Ct. 1612, 4 L.Ed.2d 1727 (1960). Judge Clark there said that "the misapplication . . . of . . . rules of contract interpretation does not rise to the stature of a 'manifest disregard' of law." *Id.* He also indicated doubt as to the current validity at that time of the *Wilko* dictum—"manifest disregard" by the "But cf." citation to the only subsequent Supreme Court case to address this subject, Bernhardt v. Polygraphic Co. of America, 350 U.S. 198, 76 S.Ct. 273, 100 L.Ed. 199 (1956). In *Bernhardt*, the Court negated the possibility of applying a nonstatutory, "manifest disregard" standard to a case like the one before us when it stated, citing this court's own decision in The Hartbridge, 62 F.2d 72 (1932), cert. denied, 288 U.S. 601, 53 S.Ct. 320, 77 L.Ed. 977 (1933), that "Whether the arbitrators misconstrued a contract is not open to judicial review." Bernhardt v. Polygraphic Co. of America, 350 U.S. at 203 n.4.

Our *Marcy Lee Manufacturing Co.*, *supra*, says that the New York law is that "as long as arbitrators remain within their jurisdiction and do not reach an irrational result, they may 'fashion the law to fit the facts before them' and their award will not be set aside because they erred in the determination or application of the law . . . ." 354 F.2d at 43. Even under this test, if it is indeed "the same" as the federal law, as the *Marcy* court may have indicated, however, the result here remains the same, for even though erroneous the arbitral majority here was not irrationally so.[16]

All of appellant's claims here reduce to the proposition that the arbitrators misconstrued the contract. The arbitral majority justified reading clause

---

15. The first mention we find of this phrase is in United States v. Farragut, 89 U.S. (22 Wall.) 406, 22 L.Ed. 879 (1874). In that case, a prize dispute cognizable in admiralty, the parties had agreed, after commencement of suit, to submit their dispute to arbitration. Unlike executory agreements to arbitrate, submissions to arbitration under the supervision of admiralty or law courts apparently generated little or no antipathy from the judiciary. Note, The Consequences of a Broad Arbitration Clause Under the Federal Arbitration Act, 52 B.U.L.Rev. at 573. The Court in *Farragut* stated nevertheless that mistakes of "law" made by the arbitrators "could have been corrected in the court below, and can be corrected here." *Id.* at 420. The Court then continued:

> The award was also liable . . . to be set aside . . . [f]or exceeding the power conferred by the submission, for

manifest mistake of law, for fraud, and for all the reasons on which awards are set aside in courts of law and chancery. *Id.* Whatever the *Farragut* Court meant by "manifest mistake of law," it did not expressly overrule the Court's statement some two decades earlier that an arbitral award will not be set "aside for error, either in law or fact." Burchell v. Marsh, 58 U.S. (17 How.) 344, 349, 15 L.Ed. 96 (1854). Even were we to read *Farragut* as permitting full scale review by admiralty courts of all questions of law decided in arbitration, *Farragut* was necessarily superseded on this point by the enactment of the Federal Arbitration Act in 1925—absent whatever gloss was given it by *Wilko*, as modified by *Bernhardt*.

16. *See* note 12 *supra.*

8 out of the charter party by considering clause 1 to conflict with it and then by placing heavy reliance on the August 30 letter from appellant's president, *supra*, which seemed to acknowledge that appellant was responsible for the freight given Rosal's failure to pay. In a court of law, this evidence would probably not have been properly admitted if, as we feel to be the case, the intent of the parties were made abundantly clear from within the four corners of the charter party. Even if admitted it should have been entitled to little or no weight since the letter was delivered when the discharge was almost complete and the check accompanying the letter was to be held in escrow pending effort by the owner to secure payment from the consignee. We see no basis, however, to reverse the award even though it is based on a clearly erroneous interpretation of the contract. Whatever arbitrators' mistakes of law may be corrected, simple misinterpretations of contracts do not appear one of them.

Judgment affirmed.

MANSFIELD, Circuit Judge (dissenting):

I must respectfully dissent.

I agree with Judge Oakes' statement that a majority of the arbitrators have "read Clause 8 out of the charter party." However, I cannot agree with his conclusion that appellant's claims here "reduce to the proposition that the arbitrators misconstrued the contract" and that the arbitrators' decision, which he concedes to be "clearly erroneous," was based upon a "misinterpretation of the contract."

As I see it, we are not confronted here with a mere error of law or misconstruction of an agreement, which would be insufficient to justify judicial intervention, see Saxis S.S. Co. v. Multifacs International Traders, Inc., 375 F. 2d 577, 582 (2d Cir. 1967); Amicizia Societa Navegazione v. Chilean Nitrate and Iodine Sales Corp., 274 F.2d 805 (2d Cir. 1960) (construction of contract term "double rigged"), but with a decision which manifestly disregards the clear and unambiguous terms of the *controlling* contract from which the arbitrators' powers are drawn, and which finds no basis in the provisions of that contract or elsewhere. Such conditions mandate our intervention. Wilko v. Swan, 346 U.S. 427 (1953); United Steel Workers v. American Mfg. Co., 363 U.S. 564, 597, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960); H. K. Porter Co. v. United Saw, File & Steel Prod. Workers, 333 F.2d 596 (3d Cir. 1964).

The pertinent provisions of the charter party contract are crystal clear and there is no conflict between them. Clause 8 plainly and unambiguously provides that "Charterers shall also remain responsible for freight . . . but only to such extent as the Owners have been unable to obtain payment thereof by exercising the lien on the cargo." There is not the slightest conflict between this specific obligation and the Charterer's general duty, as set forth in Clause 1 of the contract, "to remain fully responsible for fulfillment of charter party." The charter party obviously obligated the charterer to perform various obligations, including payment of freight according to the terms and conditions of Clause 8, and other specific duties according to the terms of other paragraphs of the agreement (e. g., stowage of cargo, payment of demurrage, wharfage, literage, subletting, lay days, etc.).

Thus the Charterer here assumed full responsibility for fulfillment of the charter party, including the obligation to pay the freight upon the owner's compliance with Clause 8, and the Owner obligated itself first to seek payment "by exercising the lien on the cargo." The Owner clearly failed to perform this latter obligation, which was a condition precedent to its exacting payment from the Charterer. The Owner should either have obtained payment of the freight from the consignee prior to or at the time of discharge or, upon completing discharge, have petitioned the court for an order placing the cargo under lien.

It did neither. Its failure to perform its obligation was not excused by the existence of the Charterer's August 30, 1972 letter to its broker enclosing a check for the freight, since the letter, aside from its not being part of the contract between the parties, was to be held in escrow pending the Owner's fulfillment of its obligation to secure payment from the consignee.

Although we are obligated to avoid frustrating the purpose of arbitration, which is to resolve disputes quickly and inexpensively by minimizing judicial review or interference, we may not go so far as to countenance a wholly baseless and irrational award. To do so would be to deny due process. Our guideline was well stated by the Supreme Court in United Steel Workers, *supra,* where it said:

"Nevertheless, an arbitrator is confined to interpretation and application of the collective bargaining agreement; he does not sit to dispense his own brand of industrial justice. He may of course look for guidance from many sources, yet his award is legitimate only so long as it draws its essence from the collective bargaining agreement. When the arbitrator's words manifest an infidelity to this obligation, courts have no choice but to refuse enforcement of the award." (363 U.S. at 597).

See, in accord, H. K. Porter Co. v. United Saw, File & Steel Prod. Workers, *supra.*

Since the arbitrators' award fails to draw its essence from the charter party contract and is wholly baseless and irrational, I would reverse the decision of the district court and direct the entry of judgment vacating the award.