Ronald **REICHMAN**, Petitioner,

v.

**CREATIVE REAL ESTATE CONSULT-ANTS, INC.**, Respondent.

No. 78 Civ. 3614 (JMC).

United States District Court,
S. D. New York.

Sept. 7, 1979.

As Amended Sept. 13 and Oct. 24, 1979.

Spector, Cohen, Hunt & Rosen, P. C., Philadelphia, Pa. (Paul R. Rosen, Edward M. Dunham, Jr., Philadelphia, Pa., of counsel), Anderson, Russell, Kill & Olick, P. C., New York City (Irene C. Warshauer, New York City, of counsel), for petitioner.

Stephen Paul Blank, New York City, for respondent.

Miller, Singer, Michaelson & Raives, New York City (Lawrence I. Brandes, New York City, of counsel), for non-party witness Alfred Miller.

## OPINION

CANNELLA, District Judge:

Motion by non-party witness Alfred Miller, Esq., to quash the deposition subpoena served upon him in connection with this litigation, is granted.

Motion by petitioner Ronald Reichman, for summary judgment vacating an arbitration award against him, is denied.

Motion by respondent Creative Real Estate Consultants, Inc., for summary judgment confirming an arbitration award in its favor, is granted.

This is a proceeding on an award entered in the arbitration between petitioner Ronald Reichman, a citizen of Pennsylvania, and respondent Creative Real Estate Consultants, Inc., a New York corporation.

Jurisdiction is based on diversity of citizenship, the amount in controversy exceeding $10,000.

## FACTS

The following facts are not disputed. On February 7, 1977, petitioner Ronald Reichman came to the New York City offices of respondent Creative Real Estate Consultants, Inc. ["Creative"], and met with its president, Leo Blank. Reichman was seeking financing to redeem and develop a parcel of land located in Pennsylvania. Blank agreed to act as Reichman's broker, for the purpose of obtaining the financing, and the parties entered into a written agreement, which provides, in pertinent part:

### EXCLUSIVE AGREEMENT FOR MORTGAGE FINANCING

AGREEMENT made this 7th day of February, 1977, at New York, New York, by and between RONALD REICHMAN, . . . (hereinafter referred to as the "Owner"), and CREATIVE REAL ESTATE CONSULTANTS, INC., . . . (hereinafter referred to as the "Broker").

WITNESSETH:

WHEREAS, Owner has a right of redemption in connection with approximately 26.24 acres of real property and improvements thereon located at and along Swedsford Road, Tredyffrin Township, Cleister County, Pennsylvania, . . (hereinafter referred to as the "Property"); and

WHEREAS, the Owner requires funds to redeem the Property and, thereafter, to develop the Property under a permanent plan; and

WHEREAS, the Owner desires to engage the Broker to obtain all the necessary and appropriate mortgage financing for redemption and development and the Broker desires to accept the engagement, solely on an exclusive basis, all as more particularly set forth herein;

NOW, THEREFORE, in consideration of the mutual covenants herein contained, the Owner and the Broker agree as follows:

1. *Exclusive Right to Arrange Mortgage Financing.* The Owner hereby grants to the Broker the sole and exclusive right to arrange mortgage financing for the Property, including, if appropriate, portions or parcels of the Property, provided, however, that if Broker fails to obtain a commitment for interim financing of the Property within 45 days from the date hereof then, in such event, notwithstanding Paragraph 3 hereof, this Agreement shall be null and void.

2. *Efforts of Broker.* The Broker agrees to attempt to obtain the mortgage financing, including, without limitation, any and all interim, gap and permanent mortgage financing, and diligently to pursue such financing.

3. *Duration of Agreement.* This Agreement shall commence on the date hereof and shall continue in full force and effect until such time as (a) the Owner ceases to have any interest in or right to the Property or portions thereof (whether legal, equitable or otherwise, and whether directly or indirectly through nominees, corporate or otherwise) or (b) until permanent financing has been secured and closed for the Property and all portions thereof, whichever is earlier.

4. *Representations of Owner.* The Owner represents and warrants (a) that he has the right to redeem the Property as of the date hereof; (b) that upon redemption he will have a fee simple interest in the Property; and (c) that upon the issuance of commitments for financing acceptable to the Owner, the Owner will proceed to closing. A breach of any of these representations shall be deemed a closing within the meaning of this Agreement.

. . . . .

7. *Commissions of Broker, General Rule.*

a. The Broker shall be entitled to a commission in an amount equal to 2% of the gross amount of all mortgage loans obtained, subject to subparagraph b;

b. If mortgage financing is obtained by a person other than the Broker, including the Owner, the Broker shall be entitled to a commission in an amount equal to 1% of the gross amount of the mortgage loan;

c. The Broker's commission shall be due and payable upon the closing of the financing to which it pertains and the Owner agrees that the commission shall be paid at the closing of said mortgage loan and that payment shall be a condition of the closing of the loan to which it pertains. The right of the Broker to its commission at the closing and as a condition to the closing shall be specifically enforceable.

8. *Credits to the Owner.* Notwithstanding paragraph 7, with respect to the Property or any portion thereof, during the term of this Agreement:

a. if the Broker obtains interim financing and thereafter obtains permanent financing; or

b. if the Broker obtains interim financing and someone other than the Broker obtains permanent financing; or

c. if someone other than the Broker obtains interim financing and the Broker obtains permanent financing; or,

d. if someone other than the Broker obtains interim financing and also obtains permanent financing, then the commission paid by the Owner to the Broker for the interim financing shall be applied against the commission earned by the Broker on the permanent financing to reduce said commission (but not below zero).

. . . . .

10. *Arbitration.* Any controversy or claim arising out of or relating to this Agreement, or the breach thereof, shall be settled by arbitration at New York, New York, in accordance with the Commercial Arbitration Rules then obtaining of the American Arbitration Association, and judgment upon the award rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof.

. . . . .

The agreement was executed, before a notary, by Reichman and by Blank on behalf of Creative.

Creative did introduce Reichman to Realty Income Trust, which, on March 11, 1977, wrote to Reichman setting forth a proposal for a "sale and leaseback" that would provide approximately $2,000,000 for the venture. After some discussions with Reichman's Philadelphia lawyers, Realty Income Trust committed itself to a $2,000,000 financing plan in a letter to Reichman dated March 31, 1977. However, this financing plan was not used. According to Reichman, the conditions of the loan were too onerous. Creative maintains that the financing package did not go through because Reichman had lied to everyone, in several material respects, and could not produce $200,000 in cash to close the deal.

Thereafter, Reichman, his Philadelphia lawyers (who, it appears, participated in the venture to some extent as principals), and various corporate entities, arranged financing for the purchase and development of the property or portions thereof.

Creative believed itself entitled to a commission of $40,000 pursuant to the agreement of February 7, 1977, but Reichman did not agree. The dispute was brought before the American Arbitration Association, and a hearing was held in New York City, on February 15, 1978, before Alfred Miller, Esq., as arbitrator.

Following the arbitration hearing, the Tribunal Administrator of the American Arbitration Association wrote a letter to counsel for the respective parties, on April 11, 1978, reading in part:

> The Arbitrator has requested the Association to address the following questions to the Parties.
>
> Regarding paragraph (7B) of the contract:
>
> 1. Was mortgage financing obtained by a person other than petitioner [Creative]?
> 2. If such financing was obtained by whom?
> 3. What was the amount of such financing?

Both parties answered "Yes" to question 1. As to question 2, Reichman answered that one Bruce Mahon, who testified at the arbitration hearing, had solicited mortgage financing from Steak & Ale Restaurants, in the amount of $350,000, and that Mahon received a fee of two percent, or $7,000, for his services. Creative answered question 2 as follows:

> Based on testimony at the hearing and petitioner's independent investigations, it appears that financing was obtained by Ronald Reichman, the respondent [in the arbitration proceeding], Bruce Mahon, . . . Drexel Burnham Lambert Incorporated, members of the New York Stock Exchange, and possibly others unknown to petitioner at this time.

In answer to question 3, Reichman stated that he obtained $350,000, which enabled him to recover only a portion of the property, and that "[t]he balance of the property was lost because financing that was necessary to acquire all the property was not obtained." Creative responded that, in addition to the $350,000, a portion of the property was "sold" to a tenant for $625,000. Creative's counsel further responded to question 3 with an elaborate tale. He re-

counted a purported "investigation" which disclosed: that approximately $1.2 million had been, or was to be, obtained by Reichman via "revenue bond financing"; that Fidelity Bond and Mortgage Co., which held title to the property by virtue of a mortgage foreclosure, conveyed it to R & R Victory Associates, Ltd., on January 11, 1978; and, that according to certain public documents, R & R Victory Associates, Ltd., was a Pennsylvania limited partnership in which Reichman and his wife were the general partners. Enclosed with Creative's response were a memorandum, dated April 24, 1978, to Creative's counsel from its president describing a telephone conversation with a third party, a description of tax-exempt revenue bonds on stationery marked "Drexel Burnham Lambert," and, a document purporting to be a copy of a deed from Fidelity Bond & Mortgage Co. to R & R Victory Associates, Ltd., dated January 11, 1978.

Reichman's counsel wrote to the Tribunal Administrator on May 16, 1978, objecting strenuously to Creative's answers, and requesting that they not be forwarded to the arbitrator. It was urged that the answers were hearsay and that, since the hearing was closed, Reichman was unable to respond.

In a document dated July 11, 1978, and sworn to on July 17, 1978, the arbitrator made the following award:

1. RONALD REICHMAN . . . shall pay to CREATIVE REAL ESTATE CONSULTANTS, INC. . . the sum of NINETEEN THOUSAND SEVEN HUNDRED FIFTY DOLLARS ($19,750.00).
2. [Reichman shall compensate Creative for $750 costs, and pay a postponement fee of $50 to the American Arbitration Association.]
3. This AWARD is in full settlement of all claims submitted to this Arbitration.

The arbitrator gave no reasons for the award.

On July 21, 1978, Creative petitioned the New York County Supreme Court to confirm the arbitration award.

On August 7, 1978, Reichman commenced the instant action in this Court, and obtained an Order to show cause why the arbitration award should not be vacated, and an Order temporarily restraining Creative from attempting to enforce the award. Following a hearing on August 11, 1978, the Court (Broderick, J.), made the following ruling:

The application herein, which I construe as a motion preliminarily to enjoin enforcement of the arbitrator's award by confirmation or otherwise pending [a] hearing on the petition, is denied. The stay contained in the order to show cause dated [August 7, 1978] is vacated.

Meanwhile, on or about July 24, 1978, Reichman's attorneys wrote to the American Arbitration Association Tribunal Administrator, requesting that "the award in this matter be reconsidered and/or modified." Further, Reichman requested that "the Arbitrator submit a written clarification as to the reasoning and findings which underly [sic] the entry of the award." By letter dated July 27, 1978, the Tribunal Administrator advised Creative that it could file objections to Reichman's request, which it subsequently did.

On August 24, 1978, Reichman removed Creative's New York Supreme Court confirmation proceeding to this Court, on the basis of diversity of citizenship. See 28 U.S.C. § 1441. That case, *Creative Real Estate Consultants, Inc. v. Ronald Reichman*, 78 Civ. 3977, was assigned to Judge Conner for all purposes. See S.D.N.Y. Calendar Rule 1.

On September 21, 1978, Reichman filed a formal motion with the American Arbitration Association seeking to "clarify, reconsider and modify the award entered July 11, 1978." These papers, along with the letters sent to the Tribunal Administrator in July and August, were apparently submitted to arbitrator Miller. In a document entitled "Disposition of Application for Clarification and Modification of Award," dated October 4, 1978, and sworn to on October 12, 1978, the arbitrator made the following ruling:

1. The application for Clarification and Modification of the AWARD is denied.

2. My prior AWARD dated July 11, 1978 is hereby reaffirmed in its entirety.

Again, no reasons were stated.

On October 30, 1978, Reichman moved to consolidate *Creative Real Estate Consultants, Inc. v. Reichman*, 78 Civ. 3977 (WCC), with the earlier-filed instant action. Creative moved for summary judgment in 78 Civ. 3977 the next day. On consent of Judge Conner, the case before him was transferred to this Court, *see* S.D.N.Y. Calendar Rule 13, and was consolidated with the instant case by Order dated November 14, 1978. *See* Fed.R.Civ.P. 42(a). The parties were informed that the petitions in the consolidated case, one to vacate and one to confirm the arbitration award, joined issue sufficiently to permit consideration of Creative's motion for summary judgment. Reichman was given an additional twenty days to respond.

On November 29, 1978, Reichman caused the Clerk of the Court to issue a deposition subpoena addressed to arbitrator Alfred Miller, commanding his appearance at an examination scheduled for December 7, 1978. Miller was served with the subpoena on or about December 1. Thereupon, Miller moved to quash the subpoena. Creative supported Miller's motion and Reichman opposed it. As to the purpose of the examination, Reichman maintains that:

[T]he deposition sought for Mr. Miller seeks to clarify the conduct of the arbitrator in:

(a) accepting unsworn, hearsay evidence on a key and pivotal issue upon which he had received sworn evidence and testimony at the hearing;

(b) accepting evidence concerning an event that was to transpire not only after the hearing closed, but after the answers to the arbitrator's questions were submitted by Creative. The event in question is the closing of the $1.2 million financing obtained from Drexel, Burnham for the construction of improvements on the property, which financing closed on May 11, 1978, a full three months after the closing of the hearing, and three days after Creative's answer to Mr. Miller's question had been filed; and

(c) refusing to allow [counsel for Reichman] to cross-examine any of the putative sources of the unsworn, hearsay testimony.

Reichman contends that by virtue of the arbitrator's conduct in allowing unsworn testimony, the arbitrator has exhibited evident partiality against Reichman. If the arbitrator's conduct did not rise to the level of partiality and prejudice, intentional or otherwise, then he so misconstrued the law (and the facts) in the rendering of his decision as to have substantially prejudiced the rights of Reichman. Such a decision, based upon the aforementioned conduct by the arbitrator, should not be allowed to stand and must be vacated.[1]

Additionally, Reichman had information that arbitrator Miller "had been associated in some way, or had performed some service in conjunction," with counsel for Creative. However, based upon Miller's affidavit that he has never had any relationship with any of the parties to the arbitration or their respective counsel, Reichman disavowed any intention to examine in this area.

On December 12, 1978, Reichman moved for summary judgment, and opposed Creative's pending motion for summary judgment. The affidavit, submitted on behalf of Reichman in opposition to Creative's motion for summary judgment, included a transcript of the arbitration hearing. The parties subsequently submitted various reply affidavits.

## DISCUSSION

All agree that on Creative's motion to confirm the arbitration award, "the court must grant such an order unless the award is vacated, modified, or corrected as prescribed in sections 10 and 11 of this title." 9 U.S.C. § 9. The specific statutory

---

1. Affidavit of Paul R. Rosen, Esq. ¶ 8, at 4–5 (filed Dec. 15, 1978).

grounds for vacation, urged by Reichman, are set forth in section 10:

In either of the following cases the United States court in and for the district wherein the award was made may make an order vacating the award upon the application of any party to the arbitration—

. . . . .

(b) Where there was evident partiality or corruption in the arbitrators, or either of them.

(c) Where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced.

9 U.S.C. § 10. Additionally, Reichman urges that the award should be vacated on the nonstatutory, judge-made rule that an arbitrator's award may be set aside for "manifest disregard" of the law. *E. g., Wilko v. Swan*, 346 U.S. 427, 436–37, 74 S.Ct. 182, 98 L.Ed. 168 (1953).

█ Generally, there is no requirement that an arbitrator state any reasons whatsoever in making an award. *See Kurt Orban Co. v. Angeles Metal Systems*, 573 F.2d 739, 740 (2d Cir. 1978). Of course, the task of a reviewing court, especially one confronted by a claim of manifest disregard of law, is made more difficult in cases where no reasons are given by the arbitrator. But the policy underlying the Arbitration Act does not permit the Court the luxury of a remand to the arbitrator for a statement of reasons:

It would be destructive of [the arbitral] process if we approved the district judge's requirement here that the arbitrators give reasons for their decision. Arbitration may not always be the speedy and economical remedy its admirers claim it is—this case is proof enough of that. But forcing arbitrators to explain their award even when grounds for it can be gleaned from the record will unjustifiably diminish whatever efficiency the process now achieves.

*Sobel v. Hertz, Warner & Co.*, 469 F.2d 1211, 1215 (2d Cir. 1972) (footnote omitted). In *Sobel* the Second Circuit cited two opinions by Judge Breitel of the New York Court of Appeals, for the proposition "that if a ground for the arbitrator's decision can be inferred from the facts of the case, the award should be confirmed." 469 F.2d at 1216. In the first of these, Judge Breitel, writing for the dissenters, discussed the policy reasons behind the limited scope of judicial review:

[The arbitrators'] award is beyond judicial review, not because this or any other court might agree with their view of the [contract], but because no court may say that a rational tribunal, especially one endowed with equitable powers, could not reach the same conclusion as did the arbitrators. . . .

It is difficult, of course, to resist the temptation to look over the shoulders of the arbitrators, as it is also difficult to envisage as reasonable any system of interpretation that does not conform to one's own. Nevertheless, arbitration is an alternative forum governed to a large extent by its own principles, and not limited by the rules of evidence, the rules of law, or even the canons of construction in the reading of documents. . . . "When parties agree to arbitrate, they agree to waive the rules of evidence and the inexorable application of the substantive rules as well. This may not always be wise, but it is within the powers of the contracting parties, and it is the import and essence of an arbitration agreement. . . ."

*Granite Worsted Mills, Inc. v. Aaronson Cowen, Ltd.*, 25 N.Y.2d 451, 459, 306 N.Y. S.2d 934, 941, 255 N.E.2d 168, 172–173 (1969) (Breitel, J., dissenting) (quoting *In re Spectrum Fabrics Corp.*, 285 A.D. 710, 714, 139 N.Y.S.2d 612, 617 (1st Dep't), *aff'd*, 309 N.Y. 709, 128 N.E.2d 416 (1955)). In a little more than two years, Judge Breitel was able to persuade his brethren on the court of the correctness of his view. Writing for a unanimous Court of Appeals, in *Lentine v. Fundaro*, 29 N.Y.2d 382, 383, 328 N.Y.S.2d

418, 419–20, 278 N.E.2d 633, 634 (1972), he said: "Save for 'complete irrationality', arbitrators are free to fashion the applicable rules and determine the facts of a dispute before them without their award being subject to judicial revision." The Second Circuit has suggested that the federal law is similar to the law of New York on this point. *Marcy Lee Manufacturing Co. v. Cortley Fabrics Co.*, 354 F.2d 42, 43 (2d Cir. 1965) (per curiam); *see I/S Stavborg v. National Metal Converters, Inc.*, 500 F.2d 424, 430–31 & n.12 (2d Cir. 1974).

The federal courts have struggled to provide the content of the "manifest disregard" standard. Initially, "it would appear that manifest disregard of the law must be something beyond and different from a mere error in the law or failure on the part of the arbitrators to understand or apply the law." *San Martine Compania De Navegacion, S.A. v. Saguenay Terminals Ltd.*, 293 F.2d 796, 801 (9th Cir. 1961), *quoted in Drayer v. Krasner*, 572 F.2d 348, 352 (2d Cir.), *cert. denied*, 436 U.S. 948, 98 S.Ct. 2855, 56 L.Ed.2d 791 (1978). Secondly, as Judge Feinberg, author of *Sobel, supra,* instructs:

> this much at least is certain: When arbitrators explain their conclusions (we reaffirmed in *Sobel* that they have no obligation to do so) in terms that offer even a barely colorable justification for the outcome reached, confirmation of the award cannot be prevented by litigants who merely argue, however persuasively, for a different result.

*Andros Compania Maritima, S.A. v. Marc Rich & Co.*, 579 F.2d 691, 704 (2d Cir. 1978). Thirdly, although "anomalous," it seems that the failure to state reasons may place the merits of an arbitration award beyond the Court's ability to review. *See I/S Stavborg v. National Metal Converters, Inc.*, 500 F.2d 424, 429 (2d Cir. 1974). Finally, "[w]hatever arbitrators' mistakes of law may be corrected, simple misinterpretations of contracts do not appear one of them." *Id.* at 432.

In the instant case, Reichman's shrill insistence that the arbitrator manifestly disregarded the law, whatever that means, is belied by the record. The contract and the transcript of the arbitration hearing provide more than "a barely colorable justification for the outcome reached," and the Court is not persuaded that the award is "completely irrational." At best, Reichman alleges a "simple misinterpretation" of the contract, which is an insufficient predicate for vacation of the award.

The thrust of Reichman's argument on the merits is easily dismissed. Reichman points to paragraph 1 of his agreement with Creative, which provides "that if Broker [Creative] fails to obtain a commitment for interim financing of the Property within 45 days from the date hereof [February 7, 1977] then, in such event . . . this Agreement shall be null and void." It is urged that it is undisputed on the record that no such commitment was procured by Creative, until after March 24, 1977.

The Court need not determine whether the Realty Income Trust proposal to provide financing, dated March 11, 1977, and Reichman's payment of $10,000, on or about March 18, to keep the proposal open, could rationally be viewed as a commitment within the meaning of the contract. Nor is it necessary to find that the quoted provision applied only to interim financing, or that Reichman's alleged misrepresentations concerning his right of redemption constituted a closing, or that there was some sort of novation, although all of these reasons are more than barely colorable. The fact is that both Reichman and his counsel stated at the arbitration hearing that Creative would have been entitled to a commission if the Realty Income Trust financing had been used.[2]

Second, Reichman's argument that he was entitled to reduce Creative's commis-

---

2. Transcript of Proceedings at 48–51, 225–26, *In the Matter of the Arbitration between Creative Real Estate Consultants, Inc. and Ronald Reichman* (American Arbitration Association, February 15, 1978); *see* Affidavit of Edward M. Dunham, Jr., Esq., Exhibit B (filed December 12, 1978) [hereinafter, pages of the arbitration hearing transcript will be cited as "Tr. ——"].

sion by the amount of commissions paid to other brokers, simply misconstrues the agreement. The agreement envisioned that other parties might procure either permanent or interim financing for Reichman, and paragraph 8 provides that "then the commission paid by the Owner to the Broker for the interim financing shall be applied against the commission earned by the Broker on permanent financing to reduce said commission (but not below zero)." The clause allows Reichman a credit on commissions paid to "Broker," a term defined in the preamble of the agreement to mean Creative. Persons or entities other than Creative are denominated in the same paragraph 8 as "someone other than the Broker." Thus, Reichman's argument, that he is entitled to a credit for commissions paid to the other entities that arranged financing, is specious.

Turning to the "rationality" of the award, the arbitrator's questions, and the affirmative answers to question 1, seemingly trigger paragraph 7.b of the agreement:

> If mortgage financing is obtained by a person other than the Broker, including the Owner, the Broker shall be entitled to a commission in an amount equal to 1% of the gross amount of the mortgage loan.

The arbitrator awarded Creative $19,750 in commissions. Therefore, the award must be confirmed, under the elusive manifest disregard standard, if there is any colorable basis in the record before the arbitrator for a finding that Reichman obtained $1,975,-000 in mortgage financing. The undisputed $350,000 in mortgage financing from Steak & Ale Restaurants is a start. Second, Mahon, a witness called by Reichman, testified at the arbitration hearing that he had arranged, or was about to arrange, $1.1 to $1.2 million in "tax free" bond financing for the development of parcels of the property, and that aspects of this transaction are akin to mortgages.[3] Finally, there was testimony at the arbitration hearing that in order to "redeem" the property from the mortgagee, Fidelity Bond & Mortgage Co., Reich-

man sold one of the tracts to Valley Forge Music Fair for $625,000.[4] Thus, a total of $2,075,000, was somehow procured by Reichman, and applied to the reacquisition and development of the property in question.

The fact that Reichman is only a part owner of R & R Victory Associates, is of no moment; the contract remained in effect as long as he had "any interest in or right to the Property or portions thereof (whether legal, equitable or otherwise, and whether directly or indirectly through nominees, corporate or otherwise)." Nor does it matter that some of the financing might not be a "mortgage loan," in the opinion of the Court. It was not the Court's opinion that was bargained for. The award was rational, and may not be vacated even if it was "clearly erroneous." *I/S Stavborg v. National Metal Converters, Inc.*, 500 F.2d 424, 429 (2d Cir. 1974).

■ Reichman's statutory argument for vacating the award is similarly meritless. The "evident partiality or corruption" language of 9 U.S.C. § 10(b), is confined to situations where the arbitrator has had dealings or relationships with one of the parties that might cause him to be biased. *See Andros Compania Maritima, S.A. v. Marc Rich & Co.*, 579 F.2d 691, 699–701 (2d Cir. 1978). There is no basis in the record for such a finding, and, in any event, Reichman has disavowed any claim of bias. *See Saxis Steamship Co. v. Multifacs International Traders, Inc.*, 375 F.2d 577, 582 (2d Cir. 1967).

Second, Reichman attempts to raise an evidentiary objection in the guise of a claim that the arbitrator was guilty of "other misbehavior by which the rights of any party have been prejudiced." 9 U.S.C. § 10(c). The objection is addressed to Creative's answers to the arbitrator's questions, which are said to be unfairly prejudicial hearsay.

■ The agreement between the parties provided that the arbitration would be conducted "in accordance with the Commercial

---

**3.** Tr. 185–87.

**4.** Tr. 95–96, 172, 195.

Arbitration Rules then obtaining of the American Arbitration Association." Those rules provide in part:

> The parties may offer such evidence as they desire and shall produce such additional evidence as the Arbitrator may deem necessary to an understanding and determination of the dispute. . . .
>
> The Arbitrator shall be the judge of the relevancy and materiality of the evidence offered and conformity to legal rules of evidence shall not be necessary.[5]

A claim similar to that urged by Reichman has been summarily rejected by the Second Circuit:

> The arbitration was conducted in accordance with the rules of the American Arbitration Association, as agreed, and we can perceive no misconduct; the arbitrators appear to have accepted hearsay evidence from both parties, as they were entitled to do. If parties wish to rely on such technical objections they should not include arbitration clauses in their contracts.

*Petroleum Separating Co. v. Interamerican Refining Corp.*, 296 F.2d 124 (2d Cir. 1961) (per curiam). In any event, both the statutory language and the case law demonstrate that the touchstone in considering claims of arbitrator misconduct is "fairness":

> In handling evidence an arbitrator need not follow all the niceties observed by the federal courts. He need only grant the parties a fundamentally fair hearing.

*Bell Aerospace Co. v. Local 516, UAW*, 500 F.2d 921, 923 (2d Cir. 1974).

Initially, "Reichman does not, and never has contended that the arbitrator did not have the right to reopen the hearing for the purpose of receiving additional evidence."[6] Thus, the case resolves to whether the information contained in Creative's answers so tainted the fundamental fairness of the arbitral process as to warrant vacation of the award.

■ The Court finds that Creative's answers to the arbitrator's questions did not unfairly prejudice Reichman. Creative answered that Reichman had obtained $350,000 in mortgage financing from Steak & Ale Restaurants, $625,000 from the sale of a portion of the premises, and, $1.2 million in revenue bond financing. These answers were merely cumulative of evidence already in the record before the arbitrator, from the mouths of Reichman's witnesses and his lawyer. Reichman's attorney had ample opportunity to explain or expand upon the nature of these transactions both at the arbitration hearing and thereafter. The $350,000 mortgage is admitted, as is the sale to Valley Forge Music Fair. As to the revenue bonds, Reichman argues:

> Nor did the evidence presented show that Reichman was obtaining $1.2 million in revenue bond financing to acquire the property. As adequately testified to before the arbitrator, that $1.2 million in revenue bond financing was obtained to construct improvements on the property.[7]

In this regard, the agreement between the parties provides that, "the Owner [Reichman] requires funds to redeem the Property and, thereafter, to develop the Property under a permanent plan." That the arbitrator found these funds included the revenue bonds, for the purpose of calculating Creative's commissions under the exclusive brokerage agreement, was, at worst, a mere error of law, if it was error at all. Even if the arbitrator "misconstrued the law (and the facts) in the rendering of his decision," he did not misbehave to Reichman's prejudice within the meaning of the statute. 9 U.S.C. § 10(c). Additionally, the arbitrator in the instant case is an attorney, familiar with the hearsay rule, and authorized, by the agreement of the parties, to consider hearsay evidence and to assign it such weight as he thought it deserved. But most importantly, in terms of fairness, the

---

5. *See* Affidavit of Stephen Paul Blank, Exhibit P (filed November 1, 1978).

6. Affidavit of Edward M. Dunham, Jr., Esq., ¶ 7, at 3 (filed January 12, 1979).

7. Affidavit of Edward M. Dunham, Jr., Esq., ¶ 54, at 16 (filed December 12, 1978).

facts of these financing transactions, as opposed to how they are characterized, were admitted by Reichman both at the arbitration hearing and in his pleadings submitted in this litigation. Accordingly, though evidence of Reichman's financial dealings may have prejudiced him, it did not do so unfairly.

There remains the deposition subpoena served on the arbitrator by Reichman. It would seem that if the Court is without power to compel an arbitrator to state the reasons for his award, a litigant should not be able to confer this authority on himself by typing a subpoena for the signature of the Clerk. In any event, finding the arbitrator's testimony to be both incompetent and irrelevant, the Court grants his motion to quash the subpoena.

 "Post-verdict" examinations of a judicial or quasi-judicial officer, be he judge, juror, or arbitrator, for the purpose of impeaching his decision, are inherently suspect, indeed, roundly condemned, in our system of jurisprudence:

> An arbitrator should not be called upon to give a reason for his decision. Inquisition of an arbitrator for the purpose of determining the processes by which he arrives at an award, finds no sanction in law.

*Martin Weiner Co. v. Fred Freund Co.*, 2 A.D.2d 341, 342, 155 N.Y.S.2d 802, 805 (1st Dep't 1956), *aff'd*, 3 N.Y.2d 806, 166 N.Y.S.2d 7, 144 N.E.2d 647 (1957); *see Fukaya Trading Co. v. Eastern Marine Corp.*, 322 F.Supp. 278, 279–80 (E.D.La.1971); *Gramling v. Food Machinery & Chemical Corp.*, 151 F.Supp. 853, 860–61 (W.D.S.C.1957); *Big-W Construction Corp. v. Horowitz*, 24 Misc.2d 145, 156, 192 N.Y.S.2d 721, 733–34 (Queens County Sup.Ct.1959), *aff'd*, 14 A.D.2d 817, 218 N.Y.S.2d 530 (2d Dep't 1961); Annot., 80 A.L.R.3d 155 (1977). Even in the context of a claim of bias, where the testimony of the arbitrator may be the "best evidence," the Second Circuit has severely circumscribed such inquiry:

> [I]n the special context of what are in effect post hoc efforts to induce arbitrators to undermine the finality of their own awards, we agree with the district court that any questioning of arbitrators should be handled pursuant to judicial supervision and limited to situations where clear evidence of impropriety has been presented.

*Andros Compania Maritima, S.A. v. Marc Rich & Co.*, 579 F.2d 691, 702 (2d Cir. 1978).

Moreover, nothing that the arbitrator could conceivably say at his deposition would have

> any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.

Fed.R.Evid. 401. The answers to the questions that Reichman seeks to ask the arbitrator already appear in the record. Did the arbitrator accept hearsay evidence in response to his questions? Yes. Was Reichman's counsel denied the opportunity to cross-examine the sources of this information after it was submitted? Yes. Did the bond financing close on May 11, 1978? This may be taken as true, but there is no reason to believe that the arbitrator could know the answer. Petitioner, however, had the opportunity to develop the facts of the bond financing at the arbitration hearing. Having failed to do so, Reichman cannot fault the arbitrator for his alleged misinterpretation of these events.

 It is clear that Reichman seeks the deposition for the forbidden purpose: to probe the arbitrator's decisionmaking process. Presumably, the arbitrator would be called upon to testify to the weight he assigned to Creative's answers, in reaching the award, on a scale of useless, interesting, persuasive or dispositive. Aside from the fact that the Court would not permit such an examination, the arbitrator's answers would not affect the result of this litigation.

## CONCLUSION

The forum that Reichman selected construed the agreement that he made to require a commission payment to a broker

that did not procure any financing. Reichman's disappointment in defeat, though not surprising, is hardly justifiable. Moreover, his attorneys' discomfort in a situation where the procedures and formalities that are their stock in trade, do not apply, is understandable. However, if their client desires findings of fact and conclusions of law, a meaningful right of appeal, and all the other incidents of our judicial process, then he should not agree to have his disputes resolved by arbitration. The lure of a speedy and economical proceeding, should be tempered by the fact that the disgruntled loser before the arbitrator is likely to bring about precisely the litigation that the agreement seeks to avoid. These thoughts were well stated by Judge Learned Hand:

> Arbitration may or may not be a desirable substitute for trials in courts; as to that the parties must decide in each instance. But when they have adopted it, they must be content with its informalities; they may not hedge it about with those procedural limitations which it is precisely its purpose to avoid. They must content themselves with looser approximations to the enforcement of their rights than those that the law accords them, when they resort to its machinery.

*American Almond Products Co. v. Consolidated Pecan Sales Co.*, 144 F.2d 448, 451 (2 Cir. 1944).

The Court's sympathy, however, is no justification for this protracted, and meritless attack on an arbitration award. *See* 28 U.S.C. § 1927; Fed.R.Civ.P. 11.

Motion by non-party witness Alfred Miller, to quash the deposition subpoena served upon him, in connection with this litigation, is granted, with costs to be taxed against petitioner Ronald Reichman.

The Court finds that there is no genuine issue as to any material fact and that respondent Creative Real Estate Consultants, Inc. is entitled to judgment as a matter of law. Accordingly, the motion by Creative Real Estate Consultants, Inc., for summary judgment, is granted, and the motion by Ronald Reichman, for summary judgment, is denied. Fed.R.Civ.P. 56(c).

The arbitration award, dated July 11, 1978, attached as Exhibit G to the petition to vacate, is confirmed, and the Clerk of the Court is directed to enter judgment upon it, 9 U.S.C. § 9, with costs to be taxed against petitioner Ronald Reichman. Fed.R.Civ.P. 54(d).

These are the Court's findings of fact and conclusions of law. Fed.R.Civ.P. 52(a).

SO ORDERED.